UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1(b)**

813829
PHELAN HALLINAN DIAMOND & JONES, PC
400 Fellowship Road, Suite 100
Mt. Laurel, NJ 08054
856-813-5500
Attorneys for WELLS FARGO BANK, N.A., SUCCESSOR BY
MERGER TO WACHOVIA BANK, N.A., SUCCESSOR BY
MERGER TO SOUTHTRUST BANK, FORMERLY KNOWN
AS SOUTHTRUST BANK, NATIONAL ASSOCIATION

In Re:

ROBERT BONGIORNO DBA ROBERT BONGIORNO

Case No:  18-16626 - CMG

Hearing Date: 10/23/2018

Judge:  CHRISTINE M. GRAVELLE

Chapter:  7

# CERTIFICATION OF PARTICIPANT
## REGARDING MOTION FOR RELIEF

I HEREBY CERTIFY that with respect to the copy of the captioned Motion for Relief submitted to the Court, the following conditions have been met:

(a)   The Affiant has acknowledged the genuineness of the original signature;

(b)   The original document was executed in completed form prior to facsimile transmission;

(c)   The document or a copy with an original signature affixed to it will be obtained by the Participant within seven business days after the date the document or pleading with the facsimile signature was electronically filed with the Court; and

(d)   In accordance with the Court's *Administrative Procedures for Filing, Signing, and Verifying Documents by Electronic Means* (collectively, the "Administrative Procedures"), at paragraph II C.2, the document containing the original signature will be maintained in paper form by the Participant for a period not less than seven years from the date of closure of the case or proceeding in which the document is filed; and that upon required the original document must be provided to other parties or the Court for review.

/s/ Sherri J. Smith
Sherri J. Smith, Esq.
Phelan Hallinan Diamond & Jones, PC
400 Fellowship Road, Suite 100
Mt. Laurel, NJ 08054
Tel: 856-813-5500 Ext. 47923
Fax: 856-813-5501
Email: Sherri.Smith@phelanhallinan.com

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>813829<br>Phelan Hallinan Diamond & Jones, PC<br>400 Fellowship Road, Suite 100<br>Mt. Laurel, NJ 08054<br>856-813-5500<br>Attorneys for WELLS FARGO BANK, N.A.,<br>SUCCESSOR BY MERGER TO WACHOVIA<br>BANK, N.A., SUCCESSOR BY MERGER TO<br>SOUTHTRUST BANK, FORMERLY KNOWN AS<br>SOUTHTRUST BANK, NATIONAL ASSOCIATION | |
| In Re:<br><br>ROBERT BONGIORNO DBA ROBERT<br>BONGIORNO | Case No:  18-16626 - CMG<br><br>Hearing Date: 10/23/2018<br><br>Judge:  CHRISTINE M.<br>GRAVELLE<br><br>Chapter:  7 |

<u>Sherri J. Smith, Esq.,</u> does hereby certify that:

1.   I am an attorney at law admitted to practice in the State of New Jersey and I am the attorney for

Wells Fargo Bank, N.A., Successor By Merger To Wachovia Bank, N.A., Successor By Merger To

Southtrust Bank, Formerly Known As Southtrust Bank, National Association ("Wells Fargo Bank, N.A.").

2.   On February 20, 1998, Irrevocable Residence Trustee Agreement, Joan Bongiorno Trustee,

Robert Bongiorno Trustee, Lauren B Lenok Trustee, Howard Bongiorno Trustee, and Joseph Bongiorno

executed a mortgage covering certain real estate commonly known as Canterbury Court, Alpine, NJ 07620,

n/k/a 2 Canterbury Court, Alpine, NJ 07620 (the "Property") in favor of First Union National Bank.  The

mortgage was recorded in the office of the Clerk in Bergen County in Mortgage Book 09818, Page 333.

3.   On April 3, 2018, Debtor, Robert Bongiorno d/b/a Robert Bongiorno**,** filed for

protection under the Bankruptcy Code, Chapter 7, Case No. 18-16626-CMG, the within case.

4.   The Debtor does not identify the Property or Schedule the Debt owed to Wells Fargo Bank, N.A on his Bankruptcy Schedules.

5.   By Deed dated February 17, 2016, recorded February 24, 2016 as V 02195 0532, Instrument #16-015522.01, the Property was transferred in favor of Debtor's parents, Joseph Bongiorno and Joan Bongiorno, as Tenants by the Entirety. Accordingly, the Property is not property of the Bankruptcy Estate.

6.   The loan matured 08/20/2018**.**  The last payment was received on 03/27/2017**.**  The total amount due as of September 20, 2018, is $195,657.45.

7. Wells Fargo Bank, N.A. is currently in discussions with Debtor's parents in an attempt to resolve issues surrounding this secured mortgage.

8. While the Debtor is no longer on the deed to the Property and is not an obligor on the Note, he is a Mortgagor on the Mortgage. Therefore Relief from the Automatic Stay is necessary in order for Movant to continue discussions with Debtor's parents.

9. The transfer of the Property falls outside of the scope of 11 U.S.C. §548 *et seq.* and therefore neither Debtor nor the Chapter 7 Trustee has any interest in the subject Property.

10.   Accordingly, Movant is seeing relief from the Automatic Stay pursuant to 11 U.S.C. §362(d)(1).

11.   I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are false, I am subject to punishment.


Dated: September 26, 2018

/s/ Sherri J. Smith
Sherri J. Smith, Esq.
Phelan Hallinan Diamond & Jones, PC
400 Fellowship Road, Suite 100
Mt. Laurel, NJ 08054
Tel: 856-813-5500 Ext. 47923
Fax: 856-813-5501
Email: Sherri.Smith@phelanhallinan.com

813829
PHELAN HALLINAN DIAMOND & JONES, PC
400 Fellowship Road, Suite 100
Mt. Laurel, NJ 08054
856-813-5500
Attorneys for WELLS FARGO BANK, N.A., SUCCESSOR
BY MERGER TO WACHOVIA BANK, N.A., SUCCESSOR BY
MERGER TO SOUTHTRUST BANK, FORMERLY KNOWN
AS SOUTHTRUST BANK, NATIONAL ASSOCIATION

| In Re: | Case No:  18-16626 - CMG |
|---|---|
| ROBERT BONGIORNO DBA ROBERT BONGIORNO | Hearing Date: TBD |
| | Judge:  CHRISTINE M. GRAVELLE |
| | Chapter:  7 |

## CERTIFICATION REGARDING CALCULATION OF AMOUNT DUE
## (NOTE AND MORTGAGE DATED 08/20/1998)

Joselle Bracy, of full age, employed as Vice President Loan Documentation

by WELLS FARGO BANK, N.A., SUCCESSOR BY MERGER TO WACHOVIA BANK, N.A., SUCCESSOR BY MERGER TO SOUTHTRUST BANK, FORMERLY KNOWN AS SOUTHTRUST BANK, NATIONAL ASSOCIATION hereby certifies the following:

Recorded on September 9, 1998, in BERGEN County, in Book 09818, Page 333

Property Address: CANTERBURY COURT, ALPINE, NJ 07620 NKA 2 CANTERBURY COURT, ALPINE, NJ 07620

Mortgage Holder:  WELLS FARGO BANK, N.A., SUCCESSOR BY MERGER TO WACHOVIA BANK, N.A.,

SUCCESSOR BY MERGER TO SOUTHTRUST BANK, FORMERLY KNOWN AS SOUTHTRUST BANK,

NATIONAL ASSOCIATION

## I. PAYOFF STATEMENT

| | |
|---|---|
| Unpaid Principal Balance | $ 185,000.00 |
| Accrued Interest from N/A to N/A (Loan Matured 08/20/2018) | $ 10,537.22 |
| (Interest rate = Variable% per year, $N/A per day x N/A days) | |
| Unearned interest from N/A to N/A: | $ 0.00 |
| Per diem interest from N/A to N/A: | $ 0.00 |
| Late Charges from N/A to N/A (N/A /mo. X N/A mos.) | $ 120.23 |
| Attorney's fees and costs as of 09/20/2018          : | $ 0.00 |

Advances through  09/20/2018                          for:

                    Real Estate Taxes:                                              $ 0.00

                    Insurance Premiums:                                          $ 0.00

                    Other:                                                              $ 0.00

                    ***Sub-Total of Advances:***                            $ 0.00

                    Less Escrow Monies:                                          ($ 0.00)

                    ***Net Advances:***                                          $ 0.00

Interest on advances from N/A to N/A:                          $ 0.00

Other charges (specify)                                               $ 0.00

Less unearned interest                                                  ($ 0.00)

                    **TOTAL DUE AS OF 09/20/2018:**              $195,657.45

                    **Date of last payment 03/27/2017**

## II. EQUITY ANALYSIS (When appropriate)

Estimated fair market value of real estate as of 05/30/2018:          $ 2,585,000.00          *

*Source: BPO (e.g. appraisal, tax bill/assessment, contract of sale, debtor's schedules, etc.)

Liens on the real estate:

    1. Real estate taxes as of N/A:                                  $ 0.00

    2. First Mortgage (principal and interest), as of 09/20/2018:          $ 195,537.22

    3. Second Mortgage (principal and interest), as of N/A:          $ 0.00

    4. Other (10% Cost of Sale and Late Charges):          $ 258,620.23
**TOTAL LIENS**:
                           $ 454,157.45

**APPARENT EQUITY AS OF 09/20/2018:**                                          **

                           $ 2,130,842.55

**If negative, insert zero (0)

I certify under penalty of perjury that the foregoing is true and correct.

                           *Joselle Brady*

                    Vice President Loan Documentation
                    Wells Fargo Bank, N.A., successor by merger to
                    Wachovia Bank, N.A., successor by merger to
                    SouthTrust Bank, formerly known as SouthTrust
                    Bank, National Association
                       *9/25/18*

# Exterior-Only Inspection Residential Appraisal Report

File ▆▆▆▆▆▆▆▆

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject prop

**SUBJECT**

| | |
|---|---|
| Property Address 2 Canterbury Ct | City Alpine State NJ Zip Code 07620 |
| Borrower Joseph Bongiorno | Owner of Public Record Bongiorno, Joseph & Joan County Bergen |

Legal Description Block# 81.01 Lot# 5 (tax map of Alpine )

Assessor's Parcel # 02-0081-0001-00005-0000    Tax Year 2017    R.E. Taxes $ 22302

Neighborhood Name Alpine    Map Reference Aci Skymaps    Census Tract 0021.00

Occupant [X] Owner [ ] Tenant [ ] Vacant    Special Assessments $ 0    [ ] PUD   HOA $ 0   [ ] per year [ ] per month

Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)

Assignment Type [ ] Purchase Transaction [ ] Refinance Transaction [X] Other (describe) Valuation

Lender/Client Wells Fargo Bank, NA    Address 18700 NW Walker Rd#92 1st Floor, Beaverton, OR 97006

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [X] Yes [ ] No

Report data source(s) used, offering price(s), and date(s).

DOM 835;NJMLS# 1525970; $3,695,000; 06/19/2015 expired 09/30/2017. The price was reduced from $4,350,000. The subject was also listed between 10/23/2013 and 10/23/2014 for $3,988,000 < continued in addendum >

**CONTRACT**

I [ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $    Date of Contract    Is the property seller the owner of public record? [ ] Yes [ ] No Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No

If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | One-Unit Housing Trends | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|
| | | PRICE | AGE | | |
| Location [ ] Urban [X] Suburban [ ] Rural | Property Values [ ] Increasing [X] Stable [ ] Declining | $(000) | (yrs) | One-Unit | 74 % |
| Built-Up [X] Over 75% [ ] 25-75% [ ] Under 25% | Demand/Supply [ ] Shortage [X] In Balance [ ] Over Supply | 902 Low | 0 | Multi-Family | % |
| Growth [ ] Rapid [X] Stable [ ] Slow | Marketing Time [ ] Under 3 mths [ ] 3-6 mths [X] Over 6 mths | 6750 High | 200 | Commercial | 10 % |
| | | 2300 Pred. | 30 | Other | 15 % |

Neighborhood Boundaries

Ruckman Rd to the north; Hillside Ave to the south; Closter border to the west; and Palisades Blvd (9W) to the east.

Neighborhood Description

Alpine is a low density suburban area of northern Bergen County. This is an affluent area of estate properties that contain some of the highest priced homes in New Jersey. Older homes in this market are commonly purchased for the value in their land and replaced with high end construction. Elementary schools were available with grades 9-12 attending Tenafly High School.

Market Conditions (including support for the above conclusions)

See Attached Addendum

**SITE**

Dimensions See attached addendum    Area 2.02 ac    Shape Irregular    View N;Res;

Specific Zoning Classification RA    Zoning Description Single Family 87,120' SF

Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No If No, describe.

See Attached Addendum

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements-Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | | Street Asphalt | [X] | [ ] |
| Gas | [X] | | Sanitary Sewer | [X] | | Alley None | [ ] | [ ] |

FEMA Special Flood Hazard Area [ ] Yes [X] No FEMA Flood Zone X    FEMA Map # 34003C0204G    FEMA Map Date 09/30/2005

Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No If Yes, describe.

The subject is located on the corner of Canterbury Ct which is a small cul de sac and Anderson Ave which is a low traveled through street. Egress from and to the property is not affected. MLS data was indicating municipal water and sewer connections.

**IMPROVEMENTS**

Source(s) Used for Physical Characteristics of Property [ ] Appraisal Files [X] MLS [ ] Assessment and Tax Records [ ] Prior Inspection [ ] Property Owner

[ ] Other (describe)    Data Source for Gross Living Area NJACTB.org

| General Description | General Description | Heating / Cooling | Amenities | Car Storage |
|---|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | [ ] Concrete Slab [ ] Crawl Space | [ ] FWA [X] HWBB | [X] Fireplace(s) # 1 | [ ] None |
| # of Stories 2 | [X] Full Basement [X] Finished | [ ] Radiant | [ ] Woodstove(s) # 0 | [X] Driveway # of Cars 2 |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | [ ] Partial Basement [ ] Finished | [ ] Other | [X] Patio/Deck 1/0 | Driveway Surface Asphalt |
| [X] Existing [ ] Proposed [ ] Under Const. | Exterior Walls Wd Shing | Fuel Gas | [ ] Porch None | [X] Garage # of Cars 2 |
| Design (Style) Colonial | Roof Surface Asphalt | [X] Central Air Conditioning | [X] Pool In-ground | [ ] Carport # of Cars 0 |
| Year Built 1969 | Gutters & Downspouts Aluminum | [ ] Individual | [X] Fence Metal | [ ] Attached [ ] Detached |
| Effective Age (Yrs) 20 | Window Type Dbl Hung/Case | [ ] Other | [ ] Other None | [X] Built-in |

Appliances [X] Refrigerator [X] Range/Oven [ ] Dishwasher [ ] Disposal [ ] Microwave [ ] Washer/Dryer [X] Other (describe) unknown

Finished area above grade contains: 10 Rooms   5 Bedrooms   4.2 Bath(s)   4760 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.).

Sprinkler System, central vacuum, security system, tennis court and heated in-ground pool.

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.).

C3;This was an exterior only inspection from the street as requested by the client. The appraiser is under the extraordinary assumption that the condition of the exterior is a representation as to the interior condition of the subject property. If the condition of interior of the dwelling contains deferred maintenance or requires repairs, the value estimated in the appraisal may not be valid. Interior information was estimated from NJMLS# 1525970, a listing of the subject property from 2017. The listing describes a custom home that had been renovated over the years. Interior photos show an updated kitchen and bathrooms but the dates of these improvements were unknown.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No

If Yes, describe

This is an exterior only appraisal. The appraiser is under the extraordinary assumption that no adverse conditions exist that will affect the livability, soundness or structural integrity of the property.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No If No, describe

| | | | |
|---|---|---|---|
| There are 4 comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 2589888 | | | to $ 3488000 |
| There are 1 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 2200000 | | | to $ 2200000 |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 2 Canterbury Ct, Alpine, NJ 07620 | 42 Warren Lane, Alpine, NJ 07620 | | 50 Allison Rd, Alpine, NJ 07620 | | 58 Glen Goin Dr, Alpine, NJ 07620 | |
| Proximity to Subject | | 0.71 miles SE | | 0.94 miles SE | | 1.61 miles SE | |
| Sale Price | $ | | $ 2700000 | | $ 2585000 | | $ 2200000 |
| Sale Price/Gross Liv. Area | $ 0.00 sq.ft. | $ 415.38 sq.ft. | | $ 455.03 sq.ft. | | $ 468.48 sq.ft. | |
| Data Source(s) | | NJMLS #1632583;DOM 186 | | NJMLS #1334317;DOM 135 | | NJMLS #1715893;DOM 205 | |
| Verification Source(s) | | Deed 2625 Pg 1024 | | Deed 1915 Pg 74 | | Deed 2892 Pg 2035 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment |
| Sale or Financing Concessions | | ArmLth | | ArmLth | | ArmLth | |
| | | Cash;0 | | Cash;0 | | Cash;0 | |
| Date of Sale/Time | | s05/17;c02/17 | | s04/15;Unk | | s01/18;c11/17 | |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 2.02 ac | 1.11 ac | 270000 | 2.00 ac | 0 | 39988 sf | 300000 |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | DT2;Colonial | DT2;Colonial | | DT2;Colonial | | DT2;Contemp. | 0 |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | 49 | 63 | | 36 | | 24 | 0 |
| Condition | C3 | C3 | | C3 | | C3 | |
| Above Grade | Total / Bdrms. / Baths | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | |
| Room Count | 10 / 5 / 4.2 | 10 / 5 / 6.0 | -20000 | 13 / 4 / 4.1 | 10000 | 10 / 4 / 3.1 | 30000 |
| Gross Living Area | 4760 sq.ft. | 6500 sq.ft. | -139200 | 5681 sq.ft. | -73680 | 4696 sq.ft. | 0 |
| Basement & Finished Rooms Below Grade | 2300sf2000sfin | 3000sf2000sfwo | 0 | 2500sf2000sfwo | 0 | 2500sf0sfin | 0 |
| | 1rr0br1.0ba1o | 1rr1br1.0ba0o | 0 | 1rr0br1.0ba0o | 0 | | 30000 |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Hwbb/Cac | Fha/Cac | 0 | Fha/Cac | 0 | Fha/Cac | 0 |
| Energy Efficient Items | None Noted | None Noted | | None Noted | | None Noted | |
| Garage/Carport | 2gbi2dw | 3ga4dw | -20000 | 3gbi5dw | -20000 | 2ga3dw | 0 |
| Porch/Patio/Deck | Patio | Patio | | Patio,Porch | 0 | Patio,Deck | 0 |
| Misc. | In-ground Pool | In-ground Pool | | In-ground Pool | | None | 25000 |
| Misc. | Tennis Court | None | 10000 | None | 10000 | None | 10000 |
| Net Adjustment (Total) | | [X] + [ ] - | $ 100800 | [ ] + [X] - | $ 73680 | [X] + [ ] - | $ 395000 |
| Adjusted Sale Price of Comparables | | Net Adj. 3.7 % Gross Adj. 17.0 % | $ 2800800 | Net Adj. -2.9 % Gross Adj. 4.4 % | $ 2511320 | Net Adj. 18.0 % Gross Adj. 18.0 % | $ 2595000 |

*(Left sidebar: SALES COMPARISON APPROACH)*

I [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research [X] did [ ] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s)  New Jersey Multiple Listing Service
My research [ ] did [X] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s)  New Jersey Multiple Listing Service
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 02/17/2016 | | | |
| Price of Prior Sale/Transfer | 10 | | | |
| Data Source(s) | Tax Records | Tax Records | Tax Records | Tax Records |
| Effective Date of Data Source(s) | 04/21/2016 | 06/16/2017 | 06/23/2015 | 04/05/2018 |

Analysis of prior sale or transfer history of the subject property and comparable sales

The appraisal was showing a non-arms length transfer of the subject for $10 on 02/17/2016. No transfer of title took place and it was just stated as a "consideration less than $100." No other transactions of the subject property is known to have occurred in the past 36 months. No other transactions of the comparable properties are known to have occurred in the previous 12 months other than their reported transactions. The effective date of the data source reported in the prior sales history is the date in which the reported data source was last updated. The information was researched on the same day as the effective date of the appraisal.

Summary of Sales Comparison Approach

There was a total of 13 closed sales in Alpine ranging in price from $902,500 to $6,750,000 over the past 12 months. The appraiser cannot control the quality or suitability of the activity available in the market during the time frame of the analysis as information was limited and many properties did not lend themselves to simplified comparisons. In this case, analysis of older transactions were required due to the limited current activity in the market. Search parameters were expanded back to 2015 to utilize comparable data with similar market appeal. See attached addendum regarding the use of dated sales and the inability to bracket some property features.

Indicated Value by Sales Comparison Approach $  2585000

*(Left sidebar: RECONCILIATION)*

Indicated Value by: Sales Comparison Approach $ 2585000     Cost Approach (if developed) $     Income Approach (if developed) $

The cost approach was not utilized due to the inability to accurate factor for the depreciation of a property this age. The subject was located in a neighborhood of primarily single family homes and not investor driven and therefore the income approach was not utilized. Full weight was given to the sales comparison approach to value in this appraisal.

This appraisal is made [X] "as is," [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $  2585000  as of  05/30/2018 , which is the date of inspection and the effective date of this appraisal.

# Exterior-Only Inspection Residential Appraisal Report

See attached addendum.

---

| | |
|---|---|
| **A D D I T I O N A L   C O M M E N T S** | |

---

| **COST APPROACH TO VALUE** (not required by Fannie Mae) |
|---|

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

Due to a lack of available building lots, land values exceeding 30% of the overall value were common of this market area. 11 forest was purchased for $2,437,500 on 10/13/2017 for the value in the land.

**C O S T   A P P R O A C H**

| | | | |
|---|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE ............................................................ =$ | | 2300000 |
| Source of cost data | Dwelling  4760 | Sq. Ft. @ $ ............. =$ | 0 |
| Quality rating from cost service    Effective date of cost data | | Sq. Ft. @ $ ............. =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | =$ | |
| Insufficient data was available to determine depreciation of a property of this age and therefore the cost approach was not utilized. | Garage/Carport | Sq. Ft. @ $ ............. =$ | |
| | Total Estimate of Cost-New ............................................ =$ | | 0 |
| | Less        Physical   Functional   External | | |
| | Depreciation | =$ ( | 0 ) |
| | Depreciated Cost of Improvements ................................... =$ | | 0 |
| | "As-is" Value of Site Improvements ................................. =$ | | |
| Estimated Remaining Economic Life (HUD and VA only)  40           Years | Indicated Value by Cost Approach    .................................... =$ | | |

| **INCOME APPROACH TO VALUE** (not required by Fannie Mae) |
|---|

**I N C O M E**

| | | | |
|---|---|---|---|
| Estimated Monthly Market Rent $ | X Gross Rent Multiplier | = $ | Indicated Value by Income Approach |

Summary of Income Approach (including support for market rent and GRM)

| **PROJECT INFORMATION FOR PUDs  (if applicable)** |
|---|

**P U D   I N F O R M A T I O N**

Is the developer/builder in control of the Homeowners' Association (HOA)?     ☐ Yes  ☐ No     Unit type(s)  ☐ Detached  ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| | | |
|---|---|---|
| Total number of phases | Total number of units | Total number of units sold |
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD?     ☐ Yes  ☐ No  If Yes, date of conversion

Does the project contain any multi-dwelling units?     ☐ Yes  ☐ No  Data source(s)

Are the units, common elements, and recreation facilities complete?     ☐ Yes  ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?     ☐ Yes  ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities

---

# Exterior-Only Inspection Residential Appraisal Report

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

# Exterior-Only Inspection Residential Appraisal Report

21.  The lender/client may disclose or distribute this appraisal report to:  the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent.  Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22.  I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations.  Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23.  The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24.  If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25.  Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1.  I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2.  I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3.  The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4.  This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5.  If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  Ronald DePiro Jr.,SCRREA | Name |
| Company Name  Wells Fargo Real Estate Valuation Services | Company Name |
| Company Address  Address on File | Company Address |
| West Caldwell , NJ 07006 | |
| Telephone Number  862-260-7101 | Telephone Number |
| Email Address  Ronald.DePiroJr@Wellsfargo.com | Email Address |
| Date of Signature and Report  05/30/2018 | Date of Signature |
| Effective Date of Appraisal  05/30/2018 | State Certification # |
| State Certification #  42RC00231700 | or State License # |
| or State License # | State |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License |
| State  NJ | |
| Expiration Date of Certification or License  12/31/2019 | SUBJECT PROPERTY |
| | ☐ Did not inspect exterior of subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did inspect exterior of subject property from street |
| 2 Canterbury Ct | Date of Inspection |
| Alpine , NJ 07620 | |
| APPRAISED VALUE OF SUBJECT PROPERTY $  2585000 | COMPARABLE SALES |
| LENDER/CLIENT | ☐ Did not inspect exterior of comparable sales from street |
| Name  No AMC | ☐ Did inspect exterior of comparable sales from street |
| Company Name  Wells Fargo Bank, NA | Date of Inspection |
| Company Address  18700 NW Walker Rd#92 1st Floor | |
| Beaverton , OR 97006 | |
| Email Address | |

# Exterior-Only Inspection Residential Appraisal Report

File # ▮▮▮▮

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 2 Canterbury Ct<br>Alpine, NJ 07620 | 11 Forest St<br>Alpine, NJ 07620 | | 56 Robin Ln<br>Alpine, NJ 07620 | | 11 Pike St<br>Alpine, NJ 07620 | |
| Proximity to Subject | | 1.00 miles SE | | 1.60 miles SE | | 1.36 miles SE | |
| Sale Price | $ | | $ 2437500 | | $ 3488000 | | $ 3200000 |
| Sale Price/Gross Liv. Area | $ 0.00 sq.ft. | $ 836.19 sq.ft. | | $ 585.73 sq.ft. | | $ 685.37 sq.ft. | |
| Data Source(s) | | NJMLS #1740305;DOM 6 | | NJMLS #1818197;DOM 23 | | NJMLS #1715117;DOM 406 | |
| Verification Source(s) | | Deed 2810 Pg 554 | | Listing Realtor | | Listing Realtor | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment |
| Sale or Financing Concessions | | ArmLth<br>Cash;0 | | Listing | | Listing | |
| Date of Sale/Time | | s10/17;Unk | | Active | -453440 | Active | -416000 |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 2.02 ac | 2.53 ac | -150000 | 1.53 ac | 150000 | 1.00 ac | 300000 |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | DT2;Colonial | DT1;Contemp. | 0 | DT2;Contemp. | 0 | DT2;Colonial | |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | 49 | 66 | 0 | 41 | 0 | 36 | 0 |
| Condition | C3 | C4 | 200000 | C3 | | C3 | |
| Above Grade | Total / Bdrms. / Baths | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | |
| Room Count | 10 / 5 / 4.2 | 9 / 4 / 4.0 | 20000 | 11 / 5 / 4.1 | 10000 | 11 / 5 / 4.2 | 0 |
| Gross Living Area | 4760 sq.ft. | 2915 sq.ft. | 147600 | 5955 sq.ft. | -95600 | 4669 sq.ft. | 0 |
| Basement & Finished | 2300sf2000sfin | 1000sf1000sfwo | 0 | 2500sf2000sfin | 0 | 2300sf2000sfin | |
| Rooms Below Grade | 1rr0br1.0ba1o | 1rr0br1.0ba0o | 0 | 1rr0br1.0ba0o | 0 | 1rr0br1.0ba1o | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Hwbb/Cac | Hwbb/Cac | | Fha/Cac | 0 | Hwbb/Cac | |
| Energy Efficient Items | None Noted | None Noted | | None Noted | | None Noted | |
| Garage/Carport | 2gbi2dw | 2cp2dw | 40000 | 2ga2dw | 0 | 3ga2dw | -20000 |
| Porch/Patio/Deck | Patio | Patio | | Patio | | Patio | |
| Misc. | In-ground Pool | In-ground Pool | | In-ground Pool | | In-ground Pool | |
| Misc. | Tennis Court | None | 10000 | None | 10000 | Wine Cellar | 0 |
| Net Adjustment (Total) | | [X] + [ ] - | $ 267600 | [ ] + [X] - | $ 379040 | [ ] + [X] - | $ 136000 |
| Adjusted Sale Price of Comparables | | Net Adj. 11.0 %<br>Gross Adj. 23.3 % | $ 2705100 | Net Adj. -10.9 %<br>Gross Adj. 20.6 % | $ 3108960 | Net Adj. -4.3 %<br>Gross Adj. 23.0 % | $ 3064000 |

Summary of Sales Comparison Approach

See attached addendum.

| ITEM | SUBJECT | COMPARABLE SALE #4 | COMPARABLE SALE #5 | COMPARABLE SALE #6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 02/17/2016 | | | |
| Price of Prior Sale/Transfer | 10 | | | |
| Data Source(s) | Tax Records | Tax Records | Tax Records | Tax Records |
| Effective Date of Data Source(s) | 04/21/2016 | 12/28/2017 | 05/25/2017 | 12/29/2011 |

Analysis of prior sale or transfer history of the subject property and comparable sales

# TEXT ADDENDUM

File #

| | |
|---|---|
| Borrower/Client | Joseph Bongiorno |
| Property Address | 2 Canterbury Ct |
| City | Alpine | County | Bergen | State | NJ | Zip Code | 07620 |
| Lender | Wells Fargo Bank, NA |

**Twelve Month Listing History of Subject Property**
Continued from Twelve Month Listing History of Subject Property: and the listing expired after 366 days on the market. The subject was also listed between 04/23/2013 and 10/22/2013 for $4,200,000 and the listing expired after 184 days on the market. There was a separate listing where the subject was listed for the value in its land between 06/19/2015 and 09/30/2017, The site was listed for $3,695,000 after being reduced from $4,350,000 spending 835 days on the market.

**Neighborhood Market Conditions**
The price range on page one of the report is a description of the high and low values along with the predominant value for the subject's neighborhood amongst similar use properties excluding pricing aberrations. Properties utilized for comparison may fall out of this neighborhood price range when search criteria is expanded into various neighborhoods or search criteria is extended over the 12 month reporting period from within the subjects neighborhood.

**Present land use:**
Other land uses noted may refer to a combination of vacant land, municipal buildings, and places of worship and/or industrial facilities.

**Analysis of the Predominant Price for the neighborhood**
ABOVE PREDOM: The value of the subject is more than the predominant neighborhood sales price, however this does not adversely affect the subject's value or marketability. The subject's value is within the neighborhood price range and the subject is not considered an over-improvement.

**Additional observed economic data:**

March 2018- New Jersey Unemployment rate was 4.6% which was even from one month prior and up 0.1% from one year prior. There were 207,095 persons unemployed in NJ which is down from -2,355 from one month prior. The national unemployment rate was 4.1%, in April which was no change from one month prior and -0.4% from one year prior. Reports were indicating accelerated job growth but wages continuing to lag.
May 2018- As reported by Freddie Mac, mortgage interest rates rose to 4.47% for a 30 year conventional fixed mortgage which is up from 3.99% in 2017.
May 30, 2018- the Dow Jones Industrial Average was at 24,467 down from a 52 week high of 26,616 on January 26, 2018.
New Jersey Population has grown 1.74% to 8,944,469 between 2010 and 2016 according to census. This was 36th in the nation during that time frame.
April 2018- " From the NAR existing home sales report: "Total existing-home sales, https://www.nar.realtor/existing-home-sales , which are completed transactions that include single-family homes, townhomes, condominiums and co-ops, decreased 2.5 percent in April to a seasonally adjusted annual rate of 5.46 million from 5.60 million in March 2018. After last month's decline, sales are 1.4 percent below a year ago. The median existing-home price3 for all housing types in April was $257,900, up 5.3 percent from April 2017 ($245,000). March's price increase marks the 74st straight month of year-over-year gains." Chief Economist Lawrence Yun stated that Realtors are reporting steady buyer activity and continues to blame the decrease in sales from a lack of existing inventory. He further stated that wages are increasing but the increase in median sale prices were still outpacing wage growth which is causing affordability challenges. In the Northeast, median sales prices were up 2.8% from April 2017 and the number of sales were down 11% from one year prior.

**Highest and Best Use**
No available data indicate an alternative use that passes the four highest and best use tests (legally permissible, physically possible, financially feasible, and maximally productive). Therefore, the highest and best use of the subject property is its current use, as improved--residential. The subject is located in a market where older homes are commonly purchased by investors for the value in their land and replaced with high end construction.

**Comments on Sales Comparison**
Site- A comparison of various transactions that were purchased for the value in their land was completed. 11 Forest St, a 2.53 acre site had closed for $2,437,500. This was compared with a sale of at 36 Dogwood, a 1.30 acre site that had closed for $2,050,000. The difference in the price per square foot between these sites was $7.29 per SF and a rounded adjustment of $7 was made for the contributory value of the additional land. Land values are high in Alpine and data was indicating approximately $300,000 per acre of surplus land.

Style & Age- Due to a lack of sales, various aged properties with similar market appeal where utilized for comparison. Market data did not show supportable evidence to warrant an adjustment strictly for the differences in the age or style of the home. Buyers in this market are more attentive to updates (effective age) then that are to the actual age of the home. The majority of sales of this age are commonly replaced with new construction in this market.

Condition- Statistical data shows that dwellings with recent renovations will extend the life of the dwelling and commonly contribute to a higher sales price. Buyers of properties without renovations will anticipate the cost to renovated kitchen, bathrooms and mechanical systems. Cosmetic items may enhance the marketability of the property but will not always contribute further to the sales price. An adjustment was made to reflect the differences. The appraiser has extracted land values and estimated the effective age and remaining life of the subject and comparable sales. The percentage difference in the estimated remaining life between the subject and comparable sales was multiplied by the extracted improvements and utilized in support of the condition adjustment.

Room Counts- The appraiser was unable to extract market data in support of an adjustment solely for the difference in room counts as these property types are primarily purchased for the value in their land. Gross living area adjustments are already factored. These properties are commonly purchased for the value in their land where difference in the room counts will not effect marketability.

Bathrooms- Statistical data will show that a buyer is will typically pay more for a property with additional bathrooms, as it adds to the functionality of the floor plan. An adjustment was made using a $20000 for a full bath and a $10000 for an additional 1/2 bath.

GLA Adjustments- Statistical data shows that properties containing additional gross living area will tend to sell for higher amounts. Adjustments were made at $80 per SF (rounded to the nearest $1000). This estimate was developed by extracting land values, dividing the difference in by the comparable properties GLA and allocating 50% of the net amount towards the gross living area. Various sized dwellings that bracketed the subject's gross living area were utilized for comparison. GLA of the comparable sales were taken from a public record sources that was assumed to be accurate.

Basement- No marketable differences were noted for below grade areas and therefore an adjustment could not be supported for area differences. When public records are not readily available through the normal course of business, the areas were estimated based on the size of the first floor and should not be considered as factual data. The lack of factual data within the comparable sales in regards to the size of the basement and buyer's reaction to potential differences precluded an adjustment. However, in most cases, an adjustment for the finished rooms that where present in the basement were considered as a buyer would commonly pay more for a similar property type that contained below grade finishing due to the added functional design. A depreciated cost adjustment of $20000 was made for the finished areas and an additional $10000 was made for the presence of a bathroom. No marketable difference was contributed for the difference in a full and half bathroom on the basement level. One fixture bathrooms are not considered to be fully functional 1/2 bathrooms and are not included in the rooms counts.

Garage- Statistical data shows that properties with additional car storage will commonly sell for higher amounts. A depreciated cost adjustment was made for the additional car storage based on the contributory value of an expected feature amongst this property type in this price range.

Amenities- Lavish amenities are common to this market and typically will add to the marketability of a property. The subject contained an in-ground pool which was an expected feature and also a tennis court which is not an expected feature but more common to these two acre sites in Alpine. With the limited data available, there were no sales that could have been utilized that bracketed both of these features. In this case, including sale for the sole purpose of bracketing the tennis court would have been misleading. An adjustment was made for the contributory value of both of these

***CONTINUED ON NEXT PAGE***

# TEXT ADDENDUM

| | |
|---|---|
| Borrower/Client | Joseph Bongiorno |
| Property Address | 2 Canterbury Ct |
| City | Alpine |
| County | Bergen |
| State | NJ |
| Zip Code | 07620 |
| Lender | Wells Fargo Bank, NA |

features as it would typically add to a properties marketability in Alpine.

SUMMARY OF SALES COMPARISON APPROACH

Reconciliation of sales comparison approach

The appraiser had researched the entire market for comparable data focusing in on the most recently closed sales in closest proximity to the subject containing the most similar market appeal. Market appeal is based on different dominant features that contribute to value and would attract similar market participants. These features could include location, style, size, condition and various site features that may attracted a typical buyer to this particular property type.

There was a total of 13 closed sales in Alpine ranging in price from $902,500 to $6,750,000 over the past 12 months. The appraiser cannot control the quality or suitability of the activity available in the market during the time frame of the analysis as information was limited and many properties did not lend themselves to simplified comparisons. In this case, analysis of older transactions were required due to the limited current activity in the market. Search parameters were expanded to utilize sales that contained similar market appeal to the subject. There was insufficient market data available in this price range that would support an adjustment for the difference in the time of these closings. Surrounding markets were not considered competitive due to dramatically different tax structures.

Comparable sale 1 contained the most similar market appeal as it was one of the few properties in this market that had closed in this price range that was not purchased to be replaced with new construction. A conversation with both the listing agent and sales agent confirmed that the square footage estimate in the public records was incorrect. The gross living area was estimated by the Realtors which was believed to be the most accurate determination. The property record card also did not contain the correct information as a substantial addition that was constructed was not on the card.

Comparable sale 2 was a sale of a property that had been purchased for the value in the land and was removed for new construction. The property was purchased in 2015 and had been rented for a few years before the dwelling was removed in 2017. A photo of the current vacant lot as well as a prior photo of this property that was taken during a previous inspection was utilized.

Comparable 3 is one of only a few sales that closed in this price range over the past 12 months. This was a similar sized contemporary styled home that was located on a smaller 1 acre site.

Comparable 4 is a sale of a smaller one story contemporary that was purchased for the value in the land. Although the improvements did not contain similar market appeal to the subject, this sale was one of only a few sales that was on a 2+ acre site that was sold within the past year within 1 mile of the subject. This sale demonstrated the low range of value for the subject property type as the subject did contain a longer estimated remaining life.

Comparable 5 is a current listing of a larger contemporary styled home that was located on a 1.5 acre site. This property, like the subject, was considered to usable in its current condition but is located in an area where properties are purchased for the value in their land. A 13% listing to sales price ratio was assigned as the over supply of homes in this price range has provided the buyers the ability to negotiate properties off of their asking prices.

Comparable 6 is a listing of a similar aged and sized colonial styled dwelling that was being marketed Alpine. This property did contain a stone front elevation but the remainder of the exterior was a lower grade stucco with the interior finishing materials consistent with the subject and other competing properties. Adjustments for the difference in the site area was also made. A 13% listing to sales price ratio was assigned as the over supply of homes in this price range has provided the buyers the ability to negotiate properties off of their asking prices.

Comparable sales 1 and 2, although dated, contained the most similar market appeal to the subject. Comparable 1 was an example of a property that was purchased with the intent to occupy while comparable sale 2 was an example of a dwelling that was located on a 2 acre site that was usable but removed for new construction. Although the mean of the adjusted value was higher, the final opinion of value was reconciled near the lower range of value as there was little supportable data showing a market for similar aged properties to be purchased for much more than the value in their land. The price per square foot is within the range of values for these competing properties.

Form data: Economic Age
60

# UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDEND

**(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)**

## Condition Ratings and Definitions

### C1

The improvements have been recently constructed and have not been previously occupied. The entire structure and all components are new and the dwelling features no physical depreciation.

*Note: Newly constructed improvements that feature recycled or previously used materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100 percent new foundation and the recycled materials and the recycled components have been rehabilitated/remanufactured into like-new condition. Improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (that is, newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).*

### C2

The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category either are almost new or have been recently completely renovated and are similar in condition to new construction.

*Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.*

### C3

The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

*Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.*

### C4

The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

*Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.*

### C5

The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

*Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.*

### C6

The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

*Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.*

## Quality Ratings and Definitions

### Q1

Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

### Q2

Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residence constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

### Q3

Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

### Q4

Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

### Q5

Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

### Q6

Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure.

## Definitions of Not Updated, Updated, and Remodeled

### Not Updated

**Little or no updating or modernization. This description includes, but is not limited to, new homes.**

Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical /functional deterioration.

### Updated

**The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.**

An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure .

### Remodeled

**Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/ or expansion.**

A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of) square footage). This would include a complete gutting and rebuild.

## Explanation of Bathroom Count

Three-quarter baths are counted as a full bath in all cases. Quarter baths (baths that feature only a toilet) are not included in the bathroom count. The number of full and half baths is reported by separating the two values using a period, where the full bath count is represented to the left of the period and the half bath count is represented to the right of the period.
Example:
3.2 indicates three full baths and two half baths.

AI Ready

# Abbreviations Used in Data Standardization Text

| Abbreviation | Full Name | Fields Where This Abbreviation May |
|---|---|---|
| A | Adverse | Location & View |
| ac | Acres | Area, Site |
| AdjPrk | Adjacent to Park | Location |
| AdjPwr | Adjacent to Power Lines | Location |
| ArmLth | Arms Length Sale | Sale or Financing Concessions |
| AT | Attached Structure | Design (Style) |
| B | Beneficial | Location & View |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade |
| br | Bedroom | Basement & Finished Rooms Below Grade |
| BsyRd | Busy Road | Location |
| c | Contracted Date | Date of Sale/Time |
| Cash | Cash | Sale or Financing Concessions |
| Comm | Commercial Influence | Location |
| Conv | Conventional | Sale or Financing Concessions |
| cp | Carport | Garage/Carport |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions |
| CtySky | City View Skyline View | View |
| CtyStr | City Street View | View |
| cv | Covered | Garage/Carport |
| DOM | Days On Market | Data Sources |
| DT | Detached Structure | Design (Style) |
| dw | Driveway | Garage/Carport |
| e | Expiration Date | Date of Sale/Time |
| Estate | Estate Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions |
| g | Garage | Garage/Carport |
| ga | Attached Garage | Garage/Carport |
| gbi | Built-In Garage | Garage/Carport |
| gd | Detached Garage | Garage/Carport |
| GlfCse | Golf Course | Location |
| Glfvw | Golf Course View | View |
| GR | Garden | Design (Style) |
| HR | High Rise | Design (Style) |
| in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| Ind | Industrial | Location & View |
| Listing | Listing | Sale or Financing Concessions |
| Lndfl | Landfill | Location |
| LtdSght | Limited Sight | View |
| MR | Mid-Rise | Design (Style) |
| Mtn | Mountain View | View |
| N | Neutral | Location & View |
| NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| o | Other | Basement & Finished Rooms Below Grade |
| O | Other | Design (Style) |
| op | Open | Garage/Carport |
| Prk | Park View | View |
| Pstrl | Pastoral View | View |
| PwrLn | Power Lines | View |
| PubTrn | Public Transportation | Location |
| Relo | Relocation Sale | Sale or Financing Concessions |
| REO | REO Sale | Sale or Financing Concessions |
| Res | Residential | Location & View |
| RH | USDA –Rural Housing | Sale or Financing Concessions |
| rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| RT | Row or Townhouse | Design (Style) |
| s | Settlement Date | Date of Sale/Time |
| SD | Semi-detached Structure | Design (Style) |
| Short | Short Sale | Sale or Financing Concessions |
| sf | Square Feet | Area, Site, Basement |
| sqm | Square Meters | Area,Site |
| Unk | Unknown | Date of Sale/Time |
| VA | Veterans Administration | Sale or Financing Concessions |
| w | Withdrawn Date | Date of Sale/Time |
| wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| Woods | Woods View | View |
| Wtr | Water View | View |
| WtrFr | Water Frontage | Location |
| wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
| | | |
| | | |
| | | |
| | | |
| | | |

# Market Conditions Addendum to the Appraisal Report

File # [ ]

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood.
This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

Property Address **2 Canterbury Ct**  City **Alpine**  State **NJ**  ZIP Code **07620**

Borrower **Joseph Bongiorno**

Instructions: The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

**M A R K E T  R E S E A R C H  &  A N A L Y S I S**

| Inventory Analysis | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 0 | 1 | 0 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | n/a | 0.33 | n/a | ☐ Increasing | ☒ Stable | ☐ Declining |
| Total # of Comparable Active Listings | 2 | 3 | 4 | ☐ Declining | ☐ Stable | ☒ Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | n/a | 9.09 | n/a | ☐ Declining | ☐ Stable | ☒ Increasing |

| Median Sale & List Price, DOM, Sale/List % | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Median Comparable Sale Price | n/a | 2200000 | n/a | ☐ Increasing | ☒ Stable | ☐ Declining |
| Median Comparable Sales Days on Market | n/a | 205 | n/a | ☐ Declining | ☒ Stable | ☐ Increasing |
| Median Comparable List Price | 2900000 | 2800000 | 2900000 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Median Comparable Listings Days on Market | 367 | 328 | 175.5 | ☐ Declining | ☒ Stable | ☐ Increasing |
| Median Sale Price as % of List Price | n/a | n/a | n/a | ☐ Increasing | ☒ Stable | ☐ Declining |
| Seller-(developer, builder, etc.) paid financial assistance prevalent? | | ☐ Yes | ☒ No | | | |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.).

It is a common practice to see seller concessions added to a sales contract days before closing by attorneys that are negotiating home inspection repairs. These are not typically considered concessions that are affecting the transaction value as these concessions are granted by the sellers in lieu of recommended repairs. Seller concessions were not common to this market area.

Are foreclosure sales (REO sales) a factor in the market? ☐ Yes ☒ No If yes, explain (including the trends in listings and sales of foreclosed properties).

Foreclosure and short sale activity is not common of this market area but does occur. Short sale and foreclosure activity are not a driving force to this market.

Cite data sources for above information.

New Jersey Multiple Listing Service

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.

The 1004mc was completed in accordance with the instructions provided utilizing sales and listings that compete with the subject property determined by applying the criteria that would be used by a prospective buyer of the subject property. This criteria did not provide sufficient results that could be relied upon to support neighborhood market trends. Median sales prices of single family homes in this neighborhood appear mostly stable. Listing prices appear stable with listing to sales price ratios near 87%. There is currently an over supply of available housing. Currently there is 20.60 months of inventory based on current demand (including pending sales). This number is down from 27.50 months of inventory 4-6 months prior and 36.67 months of inventory from 7-12 months prior. There were currently 55 active listings with another 6 properties under contract in the subjects market. Typical marketing time for properties attempting to sell at arms-length is typically exceeding 6 months.

**C O N D O / C O - O P  P R O J E C T S**

If the subject is a unit in a condominium or cooperative project, complete the following:  Project Name:

| Subject Project Data | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Active Comparable Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Unit Supply (Total Listings/Ab. Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |

Are foreclosure sales (REO sales) a factor in the project? ☐ Yes ☐ No If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

**A P P R A I S E R**

Signature

Appraiser Name  Ronald DePiro Jr.,SCRREA

Company Name  Wells Fargo Real Estate Valuation Services

Company Address  Address on File West Caldwell, NJ 07006

State License/Certification #  42RC00231700  State  NJ

Email Address  Ronald.DePiroJr@Wellsfargo.com

Signature

Supervisory Appraiser Name

Company Name

Company Address

State License/Certification #  State

Email Address

Freddie Mac Form 71  March 2009  
Page 1 of 1  
AI Ready  
Fannie Mae Form 1004MC  March 2009

# USPAP ADDENDUM

File N ███████

| | |
|---|---|
| Borrower | Joseph Bongiorno |
| Property Address | 2 Canterbury Ct |
| City Alpine | County Bergen | State NJ | Zip Code 07620 |
| Lender | Wells Fargo Bank, NA |

## This report was prepared under the following USPAP reporting option:

**☒ Appraisal Report**   This report was prepared in accordance with USPAP Standards Rule 2-2(a).

**☐ Restricted Appraisal Report**   This report was prepared in accordance with USPAP Standards Rule 2-2(b).

## Reasonable Exposure Time

My opinion of a reasonable exposure time for the subject property at the market value stated in this report is: < 6 Months

Exposure time is defined by USPAP as the "estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal." USPAP requires the reporting of the exposure time when exposure time is a component of the definition for the value opinion being developed.

## Additional Certifications

I certify that, to the best of my knowledge and belief:

**☒** I have **NOT** performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

**☐** I **HAVE** performed services, as an appraiser or in another capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Those services are described in the comments below.

Clarification of Certification #23:
The Intended User of this appraisal report is the Lender/Client. The intended use is for internal asset review and/or loan servicing (including default), subject to the stated scope of work, purpose of the appraisal, reporting requirements of this appraisal report form, and definition of market value. No additional intended users are identified by the appraiser.

## Additional Comments

Modifications to Intended Use:
The intended use of this appraisal report is for internal asset review and/or loan servicing (including default).

| **APPRAISER:** | **SUPERVISORY APPRAISER: (only if required)** |
|---|---|
| Signature: *(signature)* | Signature: |
| Name: Ronald DePiro Jr.,SCRREA | Name: |
| Date Signed: 05/30/2018 | Date Signed: |
| State Certification #: 42RC00231700 | State Certification #: |
| or State License #: | or State License #: |
| or Other (describe) _____ State # _____ | State: |
| State: NJ | Expiration Date of Certification or License: |
| Expiration Date of Certification or License: 12/31/2019 | Supervisory Appraiser Inspection of Subject Property: |
| Effective Date of Appraisal: 05/30/2018 | ☐ Did Not ☐ Exterior-only from Street ☐ Interior and Exterior |

| | |
|---|---|
| Borrower/Client | Joseph Bongiorno |
| Property Address | 2 Canterbury Ct |
| City | Alpine | County | Bergen | State | NJ | Zip Code | 07620 |
| Lender | Wells Fargo Bank, NA |



**FRONT OF SUBJECT PROPERTY**

Appraised Date: May 30, 2018

Appraised Value: $2585000

**REAR OF SUBJECT PROPERTY**

**STREET SCENE**

# ADDITIONAL PHOTOGRAPH ADDENDUM

| | |
|---|---|
| Borrower/Client | Joseph Bongiorno |
| Property Address | 2 Canterbury Ct |
| City | Alpine | County | Bergen | State | NJ | Zip Code | 07620 |
| Lender | Wells Fargo Bank, NA |



Alternate Front Photo



Alternate Street Photo



MLS Photo of the Subject

| | |
|---|---|
| Borrower/Client | Joseph Bongiorno |
| Property Address | 2 Canterbury Ct |
| City | Alpine | County | Bergen | State | NJ | Zip Code | 07620 |
| Lender | Wells Fargo Bank, NA |



Current Photo 50 Allison



MLS Photo of 56 Robin Ln

# COMPARABLES PHOTOGRAPH ADDENDUM

File #

| | |
|---|---|
| Borrower/Client | Joseph Bongiorno |
| Property Address | 2 Canterbury Ct |
| City | Alpine |
| County | Bergen |
| State | NJ |
| Zip Code | 07620 |
| Lender | Wells Fargo Bank, NA |



### Comparable Sale 1

42 Warren Lane

Alpine     NJ     07620

Date of Sale: s05/17;c02/17

Sale Price: 2700000

Sq. Ft.: 6500

$ / Sq. Ft.: 415.38



### Comparable Sale 2

50 Allison Rd

Alpine     NJ     07620

Date of Sale: s04/15;Unk

Sale Price: 2585000

Sq. Ft.: 5681

$ / Sq. Ft.: 455.03



### Comparable Sale 3

58 Glen Goin Dr

Alpine     NJ     07620

Date of Sale: s01/18;c11/17

Sale Price: 2200000

Sq. Ft.: 4696

$ / Sq. Ft.: 468.48

File #

| | |
|---|---|
| Borrower/Client | Joseph Bongiorno |
| Property Address | 2 Canterbury Ct |
| City | Alpine |
| County | Bergen |
| State | NJ |
| Zip Code | 07620 |
| Lender | Wells Fargo Bank, NA |



### Comparable Sale 4

11 Forest St

| | | |
|---|---|---|
| Alpine | NJ | 07620 |

| | |
|---|---|
| Date of Sale: | s10/17;Unk |
| Sale Price: | 2437500 |
| Sq. Ft.: | 2915 |
| $ / Sq. Ft.: | 836.19 |



### Comparable Sale 5

56 Robin Ln

| | | |
|---|---|---|
| Alpine | NJ | 07620 |

| | |
|---|---|
| Date of Sale: | Active |
| Sale Price: | 3488000 |
| Sq. Ft.: | 5955 |
| $ / Sq. Ft.: | 585.73 |



### Comparable Sale 6

11 Pike St

| | | |
|---|---|---|
| Alpine | NJ | 07620 |

| | |
|---|---|
| Date of Sale: | Active |
| Sale Price: | 3200000 |
| Sq. Ft.: | 4669 |
| $ / Sq. Ft.: | 685.37 |

## LOCATION MAP ADDENDUM

File #

| | |
|---|---|
| Borrower/Client | Joseph Bongiorno |
| Property Address | 2 Canterbury Ct |
| City Alpine | County Bergen State NJ Zip Code 07620 |
| Lender Wells Fargo Bank, NA | |



# PLAT MAP ADDENDUM

File #

Borrower/Client   Joseph Bongiorno

Property Address   2 Canterbury Ct

City   Alpine     County   Bergen     State   NJ     Zip Code   07620

Lender   Wells Fargo Bank, NA



Borrower/Client Joseph Bongiorno

Property Address 2 Canterbury Ct

City Alpine County Bergen State NJ Zip Code 07620

Lender Wells Fargo Bank, NA



| | |
|---|---|
| | File # ███████ |

Borrower/Client  Joseph Bongiorno

Property Address  2 Canterbury Ct

City  Alpine      County  Bergen      State  NJ      Zip Code  07620

Lender  Wells Fargo Bank, NA



## FLOOD INFORMATION

**Community:** BOROUGH OF ALPINE

Property is NOT in a FEMA Special Flood Hazard Area

**Map Number:** 34003C0204G

**Panel:** 0204G

**Zone:** X

**Map Date:** 09-30-2005

**FIPS:** ████

**Source:** FEMA DFIRM

## LEGEND

▨ = FEMA Special Flood Hazard Area – High Risk

▨ = Moderate and Minimal Risk Areas

**Road View:**

▨ = Forest      ▨ = Water

### Sky Flood™

No representations or warranties to any party concerning the content, accuracy or completeness of this flood report, including any warranty of merchantability or fitness for a particular purpose is implied or provided. Visual scaling factors differ between map layers and are separate from flood zone information at marker location. No liability is accepted to any third party for any use or misuse of this flood map or its data.

Borrower/Client   Joseph Bongiorno

Property Address   2 Canterbury Ct

City   Alpine                                County   Bergen          State   NJ      Zip Code   07620

Lender   Wells Fargo Bank, NA



| Date | 5/2018 |

Aerial Map

File #

| Borrower/Client | Joseph Bongiorno |
| Property Address | 2 Canterbury Ct |
| City | Alpine | County | Bergen | State | NJ | Zip Code | 07620 |
| Lender | Wells Fargo Bank, NA |



Subject
2 Canterbury Ct
Alpine, NJ 07620

AI Ready PDF Generated on 08/29/2018 10:26:03 AM

# LOST NOTE AFFIDAVIT

PERSONALLY appeared before me, _Lorelle L Kappel_ (the "Affiant"), who, upon being duly sworn, states on his/her oath, under penalty of perjury, that the following representations are true:

    1.    Affiant is a **Vice President Loan Documentation** employed by **WELLS FARGO BANK, N.A.** ("Wells Fargo"), Servicer. As such, Wells Fargo maintains business records related to the loans it services, including, but not limited to the loan at issue in this affidavit.

    2.    I am authorized to make this Affidavit on behalf of **WELLS FARGO BANK, N.A..** In the regular performance of my job functions, I am familiar with business records maintained by Wells Fargo for the purpose of servicing mortgage loans and I have personal knowledge of the operation of and the circumstances surrounding the preparation, maintenance, and retrieval of records in Wells Fargo's record keeping systems. These records (which include data compilations, electronically imaged documents, collateral file tracking, and/or others) are made at or near the time by, or from information provided by, persons with knowledge of the activity and transactions reflected in such records, and are kept in the course of business activity conducted regularly by Wells Fargo. It is the regular practice of Wells Fargo's mortgage servicing business to make these records. Unless otherwise stated, I have acquired personal knowledge of all facts set forth in this affidavit by examining these business records.

    3.    **JOSEPH BONGIORNO AND JOAN BONGIORNO** executed and delivered to **WELLS FARGO BANK N.A. AS SUCCESSOR BY MERGER TO WACHOVIA BANK N.A. FKA FIRST UNION NATIONAL BANK** a certain Note dated **08/20/1998** in the original principal amount of **$200,000.00** with an original interest rate of **8.500%**. The Note was secured by security instrument executed by **IRREVOCABLE RESIDENCE TRUST AGREEMENT, JOSEPH, JOAN, HOWARD AND ROBERT BONGIORNO AND LAUREN B LENOK**, related to the property located at **CANTERBURY CT ALPINE, NJ 07620**, dated **08/20/1998**, and recorded on **09/09/1998** in **BERGEN COUNTY, NJ COUNTY CLERKS OFFICE BK 09818 PGS 333-335.**

4.    The subject Note has been inadvertently lost, misplaced or destroyed. Affiant states that based on a review of Wells Fargo's business records, **WELLS FARGO BANK, N.A.** has not pledged, assigned, transferred, hypothecated or otherwise disposed of the Note and the Note has not been lawfully seized.

5.    Wells Fargo has made a diligent and extensive search in a good faith effort to discover the lost Note in accordance with its procedures for locating the lost Note, without success. The following areas were searched for the lost Note:

   i.   Reviewed origination and/or collateral file

   ii.  Checked internal Wells Fargo vault

   iii. Checked with Custodian

   iv.  Checked box storage records

6.    A copy of the subject Note as it exists in Wells Fargo's records is attached.

7.    Wells Fargo hereby agrees to indemnify and hold harmless **JOSEPH BONGIORNO AND JOAN BONGIORNO** against loss or damage, which may result by reason of a third party (not including the note owner, its agent(s), servicer(s), successor(s) and/or assign(s)) presenting the Note and validly enforcing the same against **JOSEPH BONGIORNO AND JOAN BONGIORNO**, following judgment and before running the statute of limitations for enforcement of the Note.

**WELLS FARGO BANK, N.A.**

Sign: _Lorelle L Kappel_

Name: _Lorelle L Kappel_

Company: **WELLS FARGO BANK, N.A.**

Title: **Vice President Loan Documentation**

Date: _2.15.18_

State of Montana

County of Yellowstone

This instrument was signed or acknowledged before me on 02/15/2018 by LORELLE L KAPPEL acting in the capacity of Vice President Loan Documentation on behalf of Wells Fargo Bank N.A.

NICHOLE SCHMIDT
NOTARY PUBLIC for the
State of Montana
SEAL
Residing at Billings, Montana
My Commission Expires
May 14, 2018

_Nichole Schmidt_

Notary Public

# FIRST UNION NA[T]
## PRIME EQUITY LINE AGREEMENT

Maximum Credit Limit $ ___200,000.00___    Customer Name(s) ___JOSEPH BONGIORNO___
___JOAN BONGIORNO___

Date of Agreement ___August    20 1998___

This Agreement and Disclosure Statement contains the terms which apply to the Prime Equity Account ("Account") with First Union National Bank. The words "I", "me" and "my" which also mean "we", "us" and "our", if more than one customer, mean the person or persons signing this Agreement. The words "you", "your", "yours", and First Union mean First Union National Bank.

### ACCESSING THE PRIME EQUITY LINE.

(a)     I, concurrent with the approval of the Prime Equity Line, shall open a special checking account, the number of which will appear on the checks ("Prime Equity Line Checks"). This special checking account shall not be dependent upon the maintenance or use of, or otherwise connected with any other checking or savings account with First Union except as provided herein. The Prime Equity Line Checks issued with the special checking account may be used to obtain extensions of credit under the Prime Equity Line up to the amount of the Maximum Credit established and set out above. All amounts advanced by First Union to pay Prime Equity Line Checks and any other charges against my special account shall constitute extensions of credit and shall be charged to my Prime Equity Line.

(b)     First Union Shall issue to me a VISA Gold Card for the purpose of obtaining extensions of credit on the Prime Equity Line.

(c)     If I have requested First Union, pursuant to an overdraft protection agreement, to pay checks which would otherwise overdraw my deposit account with First Union, such overdrafts will be charged to my Prime Equity Line and will constitute extensions of credit hereunder.

(d)     The extensions of credit to pay Prime Equity Line Checks will be in the amount of those checks. The extensions of credit made pursuant to an overdraft protection agreement shall be in increments of $100. The extensions of credit for purchases made using the VISA Gold Card will be in the amount of the purchase.

(e)     I may obtain Cash Advances from any of your branches or ATM locations up to the unused portion of the Credit Limit.

**Maximum Credit Limit.** My maximum credit line is indicated above. I agree never to allow the balance due on my Account to exceed this limit. I also agree that you are not obligated to pay any Draft or other charge against my Account, for an amount that would make my Account balance exceed my maximum credit limit, or for any amount if my Account balance is already over the maximum credit limit. Any increases in my maximum credit limit I request will require that I make a written application and sign any additional security agreements and mortgage modifications which in your opinion are necessary to secure your interest.

**Monthly Statement.** If I have an outstanding debit or credit New Balance in excess of $1.00 or if there is any finance charge imposed during a billing cycle, you will send me a statement. I promise to pay you for all Drafts plus finance charges on my Account, if any, all payable in United States Dollars according to the terms and conditions of this Agreement. I understand I am prohibited from using my Drafts to make my payments on this Account. I understand I am responsible for any fees or costs associated with the processing of my payments on my Account should I use a method of payment that results in extra costs or fees being assessed to you.

### FINANCE CHARGES.

(a)     A **FINANCE CHARGE** computed on a monthly periodic rate will be imposed, if at the end of any day of the billing cycle, there is an outstanding balance owing on my Account. The monthly periodic rate for an initial advance, if any, made by you will begin to accrue on the date of this Agreement. The monthly periodic rate for any Drafts will begin to accrue on the Transaction Date (the date you pay the draft) as indicated on my billing statement.

(b)     First Union calculates the **FINANCE CHARGE** on the Prime Equity Line by applying the monthly periodic rate to the "average daily balance." First Union takes the beginning balance of the Prime Equity Line each day, adds any new advances, and subtracts any payments or credits and unpaid finance charges, Credit Life premiums and late charges. This gives First Union the daily balance. First Union then adds up all the daily balances for the billing cycle and divides the total by the number of days in the billing cycle. This gives the "average daily balance." The annual percentage rate is determined by multiplying the periodic rate by the number of billing cycles in a year (12).

(c)     Finance Charges on purchases made with checks or VISA Gold Card will be imposed from the date of transaction.

(d)     On cash advances incurred by use of Prime Equity Line Checks or made pursuant to an overdraft protection agreement, Finance Charges will be imposed from the date of posting. Finance Charges on all cash advances made with the VISA Gold Card will be imposed from the date of transaction.

(e)     Finance Charges on the average daily balance will continue to accrue until the new balance is paid. The "new balance" is the unpaid balance of extensions of credit hereunder and Finance Charges thereon as of the last day of the billing cycle. If I pay the new balance appearing on my statement, the Finance Charges which accrued during the billing cycle in which payment was received will appear on my next billing statement.

(f)     On cash advances incurred by the use of an Automatic Teller Machine (ATM), Finance Charges will be imposed as of the date of the transaction.

(g) **Variable-Rate Feature:** The FINANCE CHARGE imposed during a billing cycle will be determined by applying the monthly periodic rate which is 1/12 of the corresponding ANNUAL PERCENTAGE RATE to the average daily balance. The ANNUAL PERCENTAGE RATE and monthly periodic rate are variable rates and subject to change on the first day of each billing cycle, if there was a prior change in the "Prime Rate" which is published regularly in the Wall Street Journal ("WSJ") Money Rates table. The Wall Street Journal is generally available in my state or area. If the WSJ Prime Rate becomes unavailable, you will select a new index which is based on an historical movement substantially similar to the original index and the new index and margin will result in an Annual Percentage Rate substantially similar to the rate in effect at the time the WSJ Prime Rate becomes unavailable. You will give me notice of this change. The corresponding ANNUAL PERCENTAGE RATE per year will be the WSJ Prime Rate published on the 15th day of the last calendar month which ended prior to the billing date indicated on your previous billing statement plus __0.000_ %. If more than one prime rate is published on the 15th day of the month, you will use the higher rate, as the WSJ Prime Rate. If the WSJ Prime Rate is not published on the 15th day of the month, the WSJ Prime Rate will be the prime rate published on the last day prior to the 15th. The current effective monthly periodic rate applicable to this line is __0.708_ % and the current effective ANNUAL PERCENTAGE RATE applicable to this line is __8.500_ %. An increase in the ANNUAL PERCENTAGE RATE and monthly periodic rate will result in increased FINANCE CHARGES and increased minimum payment amounts. The ANNUAL PERCENTAGE RATE will never be less than __0.000_% and will never exceed the maximum interest rate permitted under State law, but not more than _18.000_%. The corresponding ANNUAL PERCENTAGE RATE for each billing cycle will be shown on my billing statement for that cycle. The ANNUAL PERCENTAGE RATE will include my interest and no other costs.

**Fees.**

(A) Late Payment Fee: My minimum payment will be past due if it is not received by you on or before the payment due date shown on each monthly statement. A fee equal to 5% of the past due payment amount will be charged to my Account, if at least the minimum payment, is not received by you within 10 days after said payment due date.

(B) Returned Check Fee: If I make a payment by check, and said check is returned unpaid for any reason, my Account will be charged $15 for each such returned check.

(C) ☐ If checked, I will pay an annual non-usage fee of $_____ to be billed on my billing date during the thirteenth (13th) monthly billing cycle after the opening date of my Account and every thirteenth (13th) monthly billing cycle thereafter, following any 12 month period from the date my account balance is zero. If I obtain a credit advance under my Account at any time during the twelve (12) monthly billing cycle period following the opening date of my Account, or at any time during every twelve monthly billing cycle period thereafter, you will waive the non-usage fee.

(D) ☐ If checked, I will pay an annual maintenance fee of $_____ to be billed on my billing date during the thirteenth (13th) monthly billing cycle after the opening date of my Account and every thirteenth (13th) monthly billing cycle thereafter.

**Other Charges.** In addition to the FINANCE CHARGE which will be added to my Account each billing cycle, I will pay the following real estate closing and security filing fees:

| | "X" = First Union Pays Fee | | | "X" = First Union Pays Fee |
|---|---|---|---|---|
| • Survey | $_____ x | • GA/FL Intangible Tax | $_____ 0.00 | |
| • Title Examination | $_____ x | • GA Res Mtg Per Ln Fee | $_____ 0.00 | |
| • Check Fee | $_____ x | • Document Stamps | $_____ | |
| • Title Insurance | $_____ | • | $_____ | x |
| • Recording Fees | $_____ x | **TOTAL** | $_____ 0.00 | |
| • Appraisal Fees | $_____ | | | |
| • Flood Certification Fee | $_____ x | | | |

**FIRST UNION FEES PAID $_____ 0.00 _____**      **CUSTOMER FEES PAID $_____ 0.00 _____**

**Security.** I am giving you a mortgage, deed of trust or deed to secure debt (referred to as "Security Instrument" in this Agreement) on my home or real estate as security for my Account. This security is referred to as "Property" in this Agreement.

**Payment Schedule.** I will pay:

1. The entire outstanding balance ("New Balance") due on my Account; or

2. (a) Minimum payments equal to the finance charge or $50.00 for the billing cycle as indicated on my billing statement; or

   (b) ☐ If checked, minimum payments of $50.00 or 1.5% of balance of the New Balance, whichever is greater; and

3. All amounts of credit extensions over the maximum credit limit, any unpaid minimum payments and other charges, if any.

4. The entire outstanding balance, if not sooner paid, on __August___ 20 2018 __,(referred to as the "maturity date").

I agree to pay the minimum payment not later than the payment due date on my billing statement. If I should make a payment at any time on or before the due date which is equal to the New Balance, the entire amount of the payment will be applied to the New Balance. Any payment which is less than the New Balance will be applied in the following order: first, to the FINANCE CHARGE due on the outstanding balance and the remainder of the payment to the outstanding balance. I understand that I may prepay my Account in whole or in part at any time without penalty.

I understand that the minimum payment of finance charge only will not fully reduce the balance that is outstanding on my Account and the percentage of the outstanding balance or $50 payment, may not fully reduce the balance specified on my Account. I understand that, if this occurs, I will be required to pay the entire balance in a single "balloon" payment on the maturity date specified in this Agreement.

**ASSUMPTION NOTICE**
THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT THE REAL ESTATE SECURING THE DEBT IS SOLD, CONVEYED OR OTHERWISE TRANSFERRED.

**Obligation to Lend.** You are absolutely obligated under the terms of this Agreement to make advances not to exceed, at any one time in the aggregate, the amount indicated as the maximum credit limit and I agree to repay any advances under the terms of this Agreement. Your obligation to make advances to me under this Agreement ends when you terminate advances and demand repayment of the outstanding obligation or prohibit additional extensions of credit under this Agreement or the Security Instrument.

Nevertheless, you may waive the right to terminate or prohibit additional advances. If you do not terminate or prohibit additional advances, you remain obligated to make advances to me under the terms of this Agreement. However, that waiver does not bind you if the same or a different event occurs or is continuing at a later time. Your obligation to make advances under the terms of this Agreement also terminates when this Agreement is terminated or advances suspended by me in accordance with the terms of this Agreement.

**Change of Terms of this Agreement.** In addition to other rights you may have under this Agreement, you may change the terms and conditions of this Agreement when any of the following events shall occur:
(1)  if the index and margin used with this Account are no longer available;
(2)  if you make a change that I specifically agree to in writing;
(3)  if you make a change that will unequivocally benefit me throughout the remainder of the term of this Agreement;
(4)  if you make any insignificant change in the terms of this Agreement.

**Temporary Suspension of Credit and Reduction of Credit Limit.** I agree that you may prohibit additional extensions of credit or reduce the credit limit when any of the following events shall occur:
(1)  if the value of the Property that secures this Agreement declines significantly below the Property's appraised value during the time of this Agreement;
(2)  if you reasonably believe I will be unable to fulfill the repayment obligations under this Agreement due to a material change in my financial circumstances;
(3)  if I am in default of any material obligations under this Agreement;
(4)  if action by a governmental body does not allow you to impose the Annual Percentage Rate currently applicable to this Agreement;
(5)  if action by a governmental body adversely affects the priority of your Security Instrument to the extent that the value of the security interest is less than 120 percent of the amount of my maximum credit limit;
(6)  if you are notified by a governmental agency that regulates your lending activities that continuing advances constitute an unsafe and unsound practice;
(7)  if during any period in which the Annual Percentage Rate corresponding to the monthly periodic rate reaches the maximum interest rate allowed under this Agreement. Provided I am in compliance with the other terms of this Agreement, I understand you will reinstate credit privileges if the Annual Percentage Rate declines below the maximum Annual Percentage Rate;
(8)  if I request that you suspend any advances or reduce the credit limit;
(9)  if I indicated at the time of application that I would occupy the Property and I no longer occupy the Property or I rent a part or all of the Property to other parties.
I understand at no time will you reduce my credit limit below the outstanding balance. I understand that it is my responsibility to request reinstatement of my credit privileges that have been suspended. I further understand that I may be required to pay for an appraisal of the Property to determine if the value has changed. I agree to furnish you current personal financial statements within 30 days of your written request.

If you temporarily suspend advances or reduce the maximum credit limit, I understand you will mail or deliver written notice of your action no later than three business days after the action and the specific reason for the action.

**Termination of this Agreement.** I will be in default and you may terminate this Agreement and demand repayment of the entire outstanding balance in advance of the maturity date if any of the following events shall occur:
(1)  if I fail to make my payments within 10 days of the due date;
(2)  if I write Drafts in excess of my available credit limit or my maximum credit limit;
(3)  if a petition is filed or other proceedings started under the Federal Bankruptcy code or any state insolvency statute or if a receiver is appointed or writ or order of attachment, levy or judgment is issued against me or my Property, assets or income that affects my ability to repay this Agreement in accordance with the terms of this Agreement or that adversely affects your security rights in the Property;
(4)  if I permit any other lienholder to gain or appear to gain priority over you, except whatever first mortgage, deed of trust or deed to secure debt is outstanding on the Property, as you agree, at the time of recording of your Security Instrument to secure this Agreement;
(5)  if the Property is condemned or is totally or partially destroyed by fire or other hazards or any proceeding is commenced which materially affects your interest in the Property;
(6)  if the secured note for any prior mortgage, deed of trust or deed to secure debt or lien on the real Property is in default by failure to pay principal, interest, charges, fees, escrow items or the commencement of a foreclosure proceeding or collection action that adversely affects your security interest in the Property;
(7)  if you believe, in good faith, that I have allowed the Property to deteriorate, committed waste or destructively used or failed to maintain the Property;
(8)  if I commit fraud or misrepresent any information in the loan application, this Agreement or the Security Instrument at any time;
(9)  if I fail to disclose any known environmental condition or hazard which adversely affects your security interest in the Property;
(10)  if I fail to maintain adequate insurance coverage on the Property naming you as insured;
(11)  if I fail to pay taxes and assessments on the Property that results in a filing of a lien senior to your lien that impairs your security interest in the Property; or
(12)  if I transfer any interest or title to the Property without your consent as set forth in the terms of the Security Instrument or transfer of title occurs due to my death or by governmental action such as condemnation, however, I understand you will not terminate this Agreement and accelerate payment if such action is prohibited by federal law as of the date of this Agreement.

If an event occurs which allows the termination of advances and demand for repayment of the outstanding balance, you may, at your option and in your sole discretion, take the following action:
(1)  temporarily or permanently prohibit additional advances or reduce the maximum credit limit without demanding payment in full;
(2)  change the payment terms or payment option for the repayment of the loan; or
(3)  charge a higher rate or higher fees if I fail to meet the repayment terms.
If you do not immediately terminate the Account and demand repayment, you may take such action at a later time, if the event still exists or another event occurs at that time.

If you do terminate the Account, you may require that the outstanding balance shall become due and payable immediately in full in a single payment, without notice to me unless required by law and with interest due on the balance at the Annual Percentage Rate as provided for in the Agreement until paid. If I do not immediately pay the outstanding balance and if this obligation is referred to an attorney-at-law for collection, I agree to pay all costs and expenses, including court costs and reasonable attorney's fee, not exceeding fifteen percent (15%) of the unpaid balance and interest, providing the attorney is not a salaried employee of yours.

**Minimum Payment Change.** If I fail to pay any minimum payment by its due date or if I request a different minimum payment, you may, at your option, change the minimum payment and cancel the payment schedule 2(b) option.
I agree to give you prior written notice of my request to change my minimum payment option.

(11/97) N1 FEL Agreement

**Required Property Insurance.** I agree to purchase and to continue to maintain property insurance, including flood coverage if required, on the second Property in an amount not less than the entire outstanding balance for all prior and current obligations secured by my Property for this loan or in such an amount satisfactory to you. If I fail to maintain adequate coverage as described above, you may, either at your option or as required by law, obtain coverage to protect your rights in accordance with other provisions of this Agreement. If my Property is damaged or destroyed, I agree that you may use any insurance settlement either to repair the Property or to apply it to my outstanding balance. I agree to assign the proceeds of my insurance to you to the extent of the debt I owe and agree that the insurance company may pay you directly. I agree that you have an irrevocable power of attorney to file proofs of loss and anything else necessary to obtain the insurance proceeds in my name. Loss, damage or destruction of Property will not release me from any liability under this Agreement.

**Ownership of Drafts.** Any Draft which you supply to me is your property and must be returned to you immediately upon demand in accordance with this Agreement.

**Transfer of Account.** I cannot transfer or assign my Account to any other person, however, I recognize you can assign this Agreement.

**Change of Address.** I will advise you promptly if I change my mailing address. All written notices and statements from you to me will be considered given when placed in the United States mail, postage prepaid, and addressed to me at my current address as it appears in your records. If this is a joint account, written notice to one person is notice to the other person(s).

**Irregular Payments.** You may accept late payments or partial payments, or checks, drafts or money orders marked "Payment in Full", without losing any of your rights under this Agreement and/or applicable law.

**Deferred Payment Option.** At your option and as you designate, I understand that I may not be required to make a minimum payment during certain billing cycles. If I elect not to make my minimum payment as provided in the Agreement, I understand that this election does not eliminate the accrual of charges, including finance charges, which will continue to be applied to my account. Beginning with the next billing cycle following a deferred payment, I understand all of the provisions of this Agreement shall apply.

**Amendments.** Subject to the provisions of this Note and applicable law, you may change any part of this Agreement at any time, as long as you give me notice required by this Agreement or as may be required by law, I agree that the new terms, including any increase in the finance charge or other charges provided in this Agreement shall apply to credit extensions made on and after the effective date and to any outstanding balance owing to you on the effective date, provided that the new terms shall not apply to the outstanding balance if I pay the entire outstanding balance before the effective date of the change in terms.

**Cancellation.** I can cancel my Account at any time by returning to you all of my unused Prime Equity Line Checks, along with a letter requesting that you cancel my Account. However, my obligations under this Agreement and any changes made under it prior to cancellation will continue to apply until I have paid you all the money I owe on the Account.

**Termination or Suspension of Credit by Me and/or Joint Account Owner(s).** If one or more persons are liable with me under this Agreement, and less than all of us request in writing that future advances be terminated or temporarily suspended hereunder, you will block or otherwise suspend advances under this Agreement for ten (10) days. You will also give notice of the request for suspension or termination to all borrowers. If you do not receive a court order enforcing the termination or suspension of advances under this Agreement beyond the ten day period stated above, from the person requesting the termination or suspension of advances within the ten-day period stated above, you will unblock the Account and allow advances as if no request for termination or suspension was made.

**Removal of Lien.** At any time when the outstanding balance secured by the Security Instrument is zero, and your obligation to make advances to me under this Note has terminated, you shall at my written request to terminate my Account, return the Security Instrument to me appropriately marked as satisfied and satisfy the Security Instrument of record, however, I will pay the recording costs of that satisfaction.

**Other Provisions.** Each of us who signed this Agreement or are issued Drafts or are allowed to use this Account, are both individually and jointly obligated for all payments due under this Agreement. If you request, I will give you any information needed to reevaluate my Account or my creditworthiness. You may, at any time seek information about my financial condition from others and may provide information about my Account to others. If I apply for an increase in the credit limit for my Account or if you require that an appraisal be obtained to continue my Account, you will advise me of the cost of the appraisal before the appraisal is conducted. I understand that the appraisal will be for your use only and that I will not be entitled to a copy of the appraisal report. I agree that this Agreement shall be governed by and interpreted entirely under New Jersey law except to the extent federal law applies. In the event that the amount of interest on my Account exceeds the maximum permitted by law, you agree to repay me upon demand the amount paid which exceeds the maximum interest rate, or at your option, to reduce the then outstanding principal balance by the excess amount of interest. If any part of this Agreement is not valid, all other parts will remain enforceable. I understand I should consult a tax advisor regarding the deductibility of interest and charges for my Account.

## MY BILLING RIGHTS - I SHOULD KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about my rights and your responsibilities under the Fair Credit Reporting Act.

**I Should Notify You in Case of Errors or Questions About My Statement.**

If I think my Statement is wrong, or if I need more information about a transaction on my Statement, I should write you on a separate sheet at the address listed on my Statement. I should write you as soon as possible. You must hear from me no later than 60 days after you sent me the first statement on which the error or problem appeared. I can telephone you, but doing so will not preserve my rights.

In my letter, I must give you the following information.

- My full name and account number.
- The dollar amount of the suspected error.
- I must describe the error and explain, if I can, why I believe there is an error. If I need more information, I should describe the item I am not sure about.

**My Rights and Your Responsibilities After You Receive My Written Notice.**

You must acknowledge my letter within 30 days, unless you have corrected the error by then. Within 90 days, you must either correct the error or explain why you believe the Statement was correct.

After you receive my letter, you cannot try to collect any amount I question, or report as delinquent. You can continue to bill me for the amount I question, including finance charges, and you can apply any unpaid amount against my credit limit. I do not have to pay any questioned amount while you are investigating, but I am still obligated to pay the parts of my Statement that are not in question.

(1/97) NJ PEL Agreement

If you find that you made a mistake on my Statement, I will not have to pay any finance charges related to any questioned amount. If you didn't make a mistake, I may have to pay finance charges, and I will have to make up any missed payments on the questioned amount. In either case, you will send me a statement of the amount I owe and the date that it is due.

If I fail to pay the amount that you think I owe, you may report me as delinquent. However, if your explanation does not satisfy me and I write to you within ten days telling you that I still refuse to pay, you must tell anyone you report me to that I have a question about my Statement. And, you must tell me the name of anyone you reported me to. You must tell anyone you report me to that the matter has been settled between us when it finally is.

If you don't follow these rules, you can't collect the first $50 of the questioned amount, even if my Statement was correct.

**ARBITRATION:** At my, any guarantor, or your request, any controversy arising out of or relating to this loan shall be decided by binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association. Any controversy that is related to a class action or is part of a class action shall, at my, any guarantor, or your request, be referred for decision by arbitration as provided herein. A judgment upon award may be entered by any court having jurisdiction.

Notwithstanding the preceding binding arbitration provisions, I, any guarantor, or you may employ or exercise free, either alone, in conjunction with or during an arbitration proceeding, any provisional or ancillary remedies including foreclosure and sale of any collateral by judicial or non-judicial foreclosure, self help, set-off, attachment, garnishment and sequestration. Preservation of these remedies does not limit the power of the arbitrator to grant similar remedies.

**INFORMATION REPORTED TO CONSUMER REPORTING AGENCIES:** Under the Fair Credit Reporting Act, I have the right to notify you if I believe you have reported inaccurate information about my account to any Consumer Reporting Ageny. Such notices should be sent in writing and include my complete name, current address, Social Security number, telephone number, account number, type of account, specific item of dispute and the reason why I believe the information reported is in error. I must send my notice to: First Union, P.O. Box 560726, Charlotte, NC 28256-0726.

**SHARING INFORMATION REGARDING MY FIRST UNION RELATIONSHIPS.** I understand that from time to time you may share and use with any First Union Corporation Affiliate (e.g. First Union National Bank, First Union Brokerage Services, Inc., First Union Mortgage Corporation, etc.) my account and "other information" as you in your sole discretion consider necessary or appropriate. I have the right to direct you not to share my "other information" by notifying you in writing. I must send my name, address, Social Security number, telephone number and account type and number to: First Union, P.O. Box 11726, Roanoke, VA 24022-1726.

By signing below, I agree to all the terms contained herein and certify that I received completed copies of this Agreement and Disclosure Statement, Mortgage, and Important Terms, and 2 copies of a Notice of Right to Cancel this Agreement on the date shown above, I will refer to the above instructions if I have a problem with any billing statement you send to me.

_____ (SEAL)       _____ (SEAL)
Signature                                      Signature

_____ (SEAL)       _____ (SEAL)
Signature                                      Signature

RETURN TO   FIRST UNION NATIONAL BANK
P O BOX 50010
ROANOKE, VA 24040

**THIS IS AN OPEN-END MORTGAGE**

REC

RAPIDATA
P. O. BOX 57171
PHILA, PA 19111

*mtge*   **PAID** *m*

Prime Equity Line

# MORTGAGE

IN THIS MORTGAGE, dated __20th__ __August__ __1998__ ,
___IRREVOCABLE RESIDENCE TRUST AGREEMENT___ ___JOAN BONGIORNO TRUSTEE___
___ROBERT BONGIORNO TRUSTEE, LAUREN B LENOX TRUSTEE___ ___AND HOWARD BONGIORNO TRUSTEE___ ,
the person(s) residing at __CANTERBURY CT, ALPINE, NJ 07620__
signed below as "Owner" and is referred to in this mortgage as "I", "me", or "my", whether one or more person  "You", "your" or "First
Union" in this mortgage means FIRST UNION NATIONAL BANK with an office located at **550 Broad Street, Newark, New Jersey
07102**  If I am not indebted to First Union under the Note described below, the person(s), ___JOSEPH BONGIORNO___
_____ ,
residing at _____, are referred to in this mortgage
as "Borrower", whether one or more persons

**MODIFICATION**  Any advance made pursuant to the Note described below (including any change in the interest rate, due date or other
terms) secured by this mortgage shall be a "Modification" as defined in P L  1985 c  353 and shall be subject to the priority provisions of
the law

**THE PROPERTY**  This mortgage is on real property located at the street address of __CANTERBURY CT__
in the City of __ALPINE__, County of __BERGEN__, New Jersey, Zip Code __07620__  A further description of
the property is contained in the deed by which I acquired the Property (referred to in this mortgage as "Property")  My deed is recorded
at the __BERGEN__ County Clerk's, Register's or Recorder's Office, in book, page, liber, or registry as parcel, pin, plat, lot,
block, etc  as follows

DEED BOOK  7886   PAGE   9
LOT   5   BLOCK  81 01

The Property includes all existing and future buildings and improvements on the Property and any rights or interests resulting from my
ownership or possession of the Property

**WHAT THE MORTGAGE SECURES**   Under the terms of a Prime Equity Line  Agreement and Disclosure Statement, dated
__20th__ __August__ __1998__ (referred to in this mortgage as the "Note"), obligated to make loans from time to time to
Borrower as and when requested by Borrower, up to Borrower's maximum credit of U S  $__200,000 00__, excluding interest  The Note
provides that Borrower has the right to obtain loans under the Note and requires Borrower to make monthly installments of principal and
interest  Unless paid in full earlier, all indebtedness owed on the Note, including principal, interest and all other sums (plus interest) must
be paid in full on or before __20th__ __August__ __2018__
Intending to be legally bound and to induce you to enter into or maintain in effect the Note with Borrower, I hereby mortgage, grant and
convey the Property to you  This mortgage will secure  (i) all loans which you have already made or are later required to make to Borrower
under the Note and this mortgage, (ii) any amounts which you may advance to insure, pay taxes on, or repair the Property if I or the
Borrower fail to do so, (iii) your cost of collection in the event of default as provided in the Note, (iv) all finance charges and other charges
you impose on all such loans, advances and expenses as provided in the Note and this mortgage, (v) the performance of all of Borrower's
promises in the Note and all of my promises in this mortgage, and (vi) all my extensions, renewals, modifications or amendments of the Note

**OWNERSHIP**  By signing below, I warrant that I am the only owner of the Property, and that I have the right to mortgage it to you  I
agree to defend for you and any successors and assigns, any lien claims, valid or invalid, asserted against the Property, and to reimburse
you for any loss or damage you may suffer as a result of any and all lien claims against the Property  If the Property is a condominium or
part of a planned unit development, I have verified that this mortgage is permitted under any condominium or relative documents, and if any
approval(s) is required, I have obtained all approvals

**PAYMENTS OF PRINCIPAL AND INTEREST**  Borrower will pay when due, the principal and interest on the Note  Unless the law
says otherwise, you will apply all  payments that you receive on account of the Note first to interest due on the Note, then to any other
charges owing under the Note,  and then to the principal balance remaining on the Note

**OTHER MORTGAGE(S)**  I hereby warrant that the Property is free of claims and demands of any other person except for other
mortgage(s) I already told you about  I will perform all of my obligations, including making all payments when due, under any and all
existing (or any later) mortgage(s) on the Property

**TAXES**  I will pay all real estate taxes, assessments, water and sewer rents and other charges on the Property when they come due  I will
provide you with proof of payment upon request

**PROTECTION OF YOUR INTEREST IN THE PROPERTY**  If I do not perform any of my duties stated in this mortgage, or if a legal
action is brought concerning the Property that adversely affects your  interest in the Property,  then you, at your option, and with notice to
me and/or Borrower, may make any court appearances, pay sums, including reasonable attorney's fees, and take necessary action to protect
your interest in the Property  Any amount of money  that you pay, that is authorized by this paragraph, will be added to the principal amount
of the Note, earn interest at the rate of the Note, and be secured by this mortgage, including the interest

You, or someone authorized by you, may enter upon and inspect the Property at reasonable times if you give me prior notice

(02/98) NJ MORTGAGE

BK09818PG333

**MAINTENANCE** I will keep the building(s) on the Property in good condition and repair I will not make any major changes (except for repair work) or tear down any building(s) without your prior written consent I have no knowledge of any environmental condition or hazard which adversely affects the Property I have no knowledge of any work that has been done on, or materials furnished to, or improvements made to the Property within the last 90 days, except such improvements, work and/or materials for which the provider(s) has been paid in full

**INSURANCE** I will keep the building(s) and improvements on the Property insured at all times against loss by fire, flooding and any other "extended coverage" hazard you may specify I may choose the insurance company, but that company must be acceptable to you I will deliver the policy or the other proof of insurance to you at your request The policy must be for at least the amount and time period you specify and must name you as mortgagee This means you have the right to receive payment on all insurance claims, up to the amount of your interest in the Property, before me You may permit me to use any insurance proceeds you receive to repair any damage to the Property, if you reasonably believe the proceeds are adequate for this purpose Otherwise, you will apply the proceeds to reduce the balance Borrower owes under the Note

If I abandon the Property, or if I fail to respond to you within 30 days from the date you mail notice to me that the insurance carrier offers to settle a claim for insurance benefits, you are authorized to collect and pay the insurance proceeds, at your option, either to repair the Property or reduce what Borrower owes under the Note

**CONDEMNATION** If the Property is taken or condemned by authorities, I hereby assign all proceeds of any and all claims for damages, direct or indirect, in connection with the taking or condemnation, to you and all of said proceeds shall be paid to you, subject to the rights of any prior and superior lien on the Property Subject to the rights of any prior and superior lien on the Property, you will use the proceeds to pay Borrower's indebtedness under the Note, and any amounts remaining after the Note has been paid in full will be delivered to me or Borrower

**SALE OF PROPERTY** I will not sell, transfer ownership or mortgage the Property, in whole or in part, to any other person without your prior written consent

**DEFAULT** The Note states when, why and how you may declare a default When you declare a default under the Note, this mortgage will also be in default If I do not perform my duties under this mortgage, you may, at your option, declare the Note and this mortgage to be in default When you declare a default, you may also give me and Borrower notice of your intention to take action, and of my or Borrower's right to cure the default within any time period as may then be provided by law If cure is not effected by me or the Borrower within that time period, you can require the Borrower to immediately pay us the entire balance owing under the Note You may also foreclose on this mortgage This means you can arrange for the Property to be sold, as provided by law, in order to pay the entire amount Borrower owes you under the Note

If the money you receive from the sale is not enough to pay the entire amount the Borrower owes you, Borrower will owe you the difference If you receive more than the Borrower owes, you will pay the surplus to me or the Borrower, as you alone chose If you foreclose on the Property, you shall have the right to collect in that proceeding, all expenses of foreclosure, including but not limited to, reasonable attorney's fees and costs of documents, abstracts, and title reports

**ASSIGNMENT OF RENTS, APPOINTMENT OF RECEIVER** As additional collateral to secure the Note, I hereby grant to you any and all rents of the Property But unless and until you make all amounts owing under the Note become immediately due and payable, or I abandon the Property, I have the right to collect and retain the rents as they become due and payable

If you make all amounts owing under the Note become immediately due and payable, or if I abandon the Property, you shall have the right to have a court appoint a person called a receiver to enter upon, take possession of, and manage the Property, and collect all rents of the Property, including those past due All rents that the receiver collects shall be used to pay all costs of managing the Property and collecting the rents, including but not limited to the receiver's fees, premiums on the receiver's bonds and reasonable attorney's fees, and second to all amounts secured by this mortgage The receiver shall account only for the rents he actually received

**BINDING AND CONTINUED EFFECT** Until the Borrower pays the Note in full, and this mortgage is fully satisfied, the provisions of this mortgage will be binding on me and all future owners and tenants of the Property This mortgage is for your benefit and that of anyone to whom you may transfer and assign it From time to time, the amounts Borrower owes you on the Note may be entirely repaid and borrowed again This mortgage is intended to remain in effect so long as, and during such times as, Borrower has the right to require you to make new loans, even if the Borrower does not owe you anything on the Note

**HAZARDOUS SUBSTANCES** I shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property I shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and maintenance of the Property

I shall promptly give you written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge If I learn or am notified by any governmental or regulatory authority that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I shall promptly take all necessary remedial actions in accordance with Environmental Law

As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law, including the following substances gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials As used in this paragraph, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety, or environmental protection

**LOAN CHARGES** If the Note secured by this mortgage is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Note, exceed permitted limits, then (1) any such loan charges shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (2) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower You may choose to make this refund by reducing the principal owed under the Note or by mailing a direct payment to Borrower If a refund reduces principal, the reduction will be treated as a partial prepayment under the Note

**WAIVER OF HOMESTEAD** I waive all rights under any law, to prevent you from applying all proceeds from the Property to fully satisfy the amounts due and owing under the Note

**RELEASE OF THIS MORTGAGE** I or Borrower may advise you in writing that either or both of us do not wish this mortgage to secure any later loans to Borrower My and/or Borrower's notice shall not become effective until the fifth business day after you receive it at your address stated above After all amounts outstanding on the effective date of my or Borrower's notice, and your finance charges and other charges have been paid in full, you will promptly declare this mortgage satisfied

**GOVERNING LAW** The law of the state in which the Property is located, and any applicable federal law, will govern the terms of this mortgage

**NOTICES** Any notice required to be given to you by me or Borrower, or any third party, either under this mortgage or as otherwise required by law or the Note, shall be given to you by certified mail, return receipt requested at your address stated above Any notice required to be given by you to me, shall be given by delivering it or by mailing such notice by first class mail, addressed to me or the current owner residing at the Property, or at such other address as I may designate by notice to you Notice to Borrower and any other person(s) obligated on the Note shall be given by first class mail to the names and addresses as they appear in your records

**COPIES** I and Borrower will receive copies of the Note, this mortgage and any supplementing agreements, after we execute those documents or after those documents are recorded with the appropriate office

**WAIVER OF YOUR RIGHTS.** Without notice to me and/or Borrower, you may (i) delay enforcing any of your rights under the Note or this mortgage without losing them, (ii) extend the time for payment or modify or amend the Note or (iii) add, release or permit the substitution of parties to the Note or collateral securing the Note You can take any or all of these actions without in any way affecting your rights under this mortgage Any waiver by you of any provision of the Note or this mortgage will not be a waiver of the same of any other provision on any other occasion

**INTEREST RATE AFTER JUDGMENT** Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action on this mortgage, shall be the rate stated in the Note

### REQUEST FOR NOTICE OF DEFAULT AND FORECLOSURE
### UNDER SUPERIOR MORTGAGES OR DEEDS OF TRUST

I, Borrower, and First Union request the holder of any mortgage, deed of trust or other encumbrance with a lien having priority over this mortgage to give notice to First Union at its address stated on page one of this mortgage, of any default under the superior encumbrance and of any sale or other foreclosure action

**SIGNATURES** I and Borrower have signed and sealed this mortgage, the day and year first above written

_Joan Bongiorno_ (SEAL)
Owner
IRREVOCABLE RESIDENCE TRUST AGREEMENT

_Robert Bongiorno_ (SEAL)
Owner
ROBERT BONGIORNO TRUSTEE, LAUREN B LENOX TRUSTEE

_Lauren Lenox trustee_ (SEAL)
OWNER

_____ (SEAL)
Borrower

_Joan Bongiorno_ (SEAL)
Owner
JOAN BONGIORNO TRUSTEE

_Howard Bongiorno trustee_ (SEAL)
AND HOWARD BONGIORNO TRUSTEE

_Joseph Bongiorno_ (SEAL)
Borrower
JOSEPH BONGIORNO

_____ (SEAL)
Borrower

**STATE OF NEW JERSEY** )
)ss
**COUNTY OF** Bergen )

BE IT REMEMBERED, that on this 20th day of August 1998, before me, a Notary Public of New Jersey, personally appeared Howard Bongiorno, Lauren B. Lenox, Joan Bongiorno, Joseph Bongiorno and Robert Bongiorno who is/are known (or were satisfactorily proven) to me to be the person(s) named in and who executed the above mortgage, and thereupon he/she/they acknowledged before me that he/she/they signed, sealed and delivered the same as a voluntary act and deed, for the uses and purposes expressed in the mortgage, and desired that it be recorded as such

MARK CASSIDY
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 7/14/2000

_Mark Cassidy_
Notary Public

CAROL FEDER
Prepared By (Type or Print)

_signature_
Prepared By (Signature)

BK09818PG335

(02/98) NJ MORTG.

**END OF DOCUMENT**

**SouthTrust Corporation**
P.O. Box 2554
Birmingham, Alabama 35290
(205) 254-5219

Anitta Pross
Senior Administrative Officer

RECEIVED

Jun 11 30 AM '00

COMPTROLLER OF
THE CURRENCY
SOUTHEAST DISTRICT

June 6, 2000

Mr. John O. Stein
Licensing Manager
Comptroller of the Currency
245 Peachtree Center Avenue, N.E.
Atlanta, Georgia 30303

Re:    Termination of National Bank Status

Dear Mr. Stein:

This is to notify you that SouthTrust Bank, National Association, Birmingham, Alabama, will become an Alabama state-chartered bank effective today, June 6, 2000. The title of the bank will be SouthTrust Bank. The Cashier of the bank will be sending you the appropriate documentation regarding the conversion in the very near future.

I want to thank you and your staff for all the work you have done for SouthTrust, and personally, for all the help you afforded me over the years. It was always a pleasure dealing with the OCC.

Please don't hesitate to contact me at the above telephone number if you have any questions.

Very truly yours,

Anitta Pross

Anitta Pross



Comptroller of the Currency
Administrator of National Banks

Large Bank Licensing, LIC #7-13
Washington, DC 20219

December 29, 2004

OCC Control Nr. 2004-ML-02-0010

Ms. Courtney D. Allison
Assistant General Counsel
Legal Division / NC0630
Wachovia Bank, National Association
301 South College Street
Charlotte, North Carolina 28288-0630

Dear Ms. Allison:

This letter is the official certification of the Office of the Comptroller of the Currency for the merger of SouthTrust Bank, Birmingham, Alabama, FDIC Certificate Nr. 849, into and under the charter and title of Wachovia Bank, National Association, Charlotte, North Carolina, Charter Nr. 1, effective January 3, 2005.

This letter also serves as the official authorization for Wachovia Bank, National Association, Charlotte, North Carolina, Charter Nr. 1, the resulting bank, to operate the former head office and branches of SouthTrust Bank as branches at the sites indicated in the appendix to this letter. Please furnish a copy of this certificate to personnel responsible for branch administration.

The OCC also authorizes the resulting bank, should the merger occur between Call Report dates, to recalculate its legal lending limit. The new lending limit should be calculated by using data from the last Call Report of the individual banks filed prior to consummating the merger, as adjusted for the combination. The resulting bank will then file a new Call Report and begin calculating its legal lending limit according to 12 C.F.R. 32.4(a) at the end of the quarter following consummation of the merger.

Sincerely,

Richard T. Erb
Licensing Manager

appendix

Exhibit C



Comptroller of the Currency
Administrator of National Banks

Large Bank Licensing
Mail Stop 7-13
250 E Street, SW
Washington, DC 20219

February 27, 2006

Ms. Courtney D. Allison
Senior Vice President and Assistant General Counsel
Wachovia Corporation
Legal Division NC0630
One Wachovia Center
301 South College Street
Charlotte, NC 28288

Re:  Applications to convert Western Financial Bank, Irvine, CA to a national bank and to
     merge Wachovia Bank, National Association, Charlotte, NC into the converted bank
     under the articles of association and the name of Wachovia Bank, National Association
     OCC Control Nos.: 2005-ML-01-0007 and 2005-ML-02-0007

Dear Ms. Allison:

The Office of the Comptroller of the Currency ("OCC") has reviewed and found no exception
to the documents submitted on behalf of Western Financial Bank to complete the conversion
process. Accordingly, this letter is the official authorization of the OCC for Western Financial
Bank, Irvine, California to convert to a national banking association with the name of Western
Financial Bank, National Association on March 1, 2006. This letter also is the official OCC
certification for the merger of Wachovia Bank, National Association, Charlotte, North
Carolina, Charter Nr. 1, with and into Western Financial Bank, National Association, Charter
Nr. 24648, effective March 1, 2006. The resulting bank will be named Wachovia Bank,
National Association and its main office will be located in Charlotte, North Carolina. In
addition, the OCC has granted your request that Charter Nr. 1 be reassigned to the bank
resulting from this merger.

This letter also constitutes official OCC authorization for the branches of Western Financial
Bank, National Association. These branch authorizations will convey automatically to the
bank resulting from the merger and will not be reissued in the name of the resulting bank. In
addition, this serves as official OCC authorization for the bank resulting from the merger to
operate the former main office of Western Financial Bank, National Association as a branch.
A list of the branches, with the OCC's branch authorization numbers, is attached. The list
includes the branches resulting from both the conversion and the merger. Please furnish a
copy of this letter to personnel responsible for branch administration.

Ms. Courtney D. Allison
February 27, 2006
Page 2

If the transaction does not occur as represented in your letter dated February 22, 2006, this certification must be returned to the OCC.

If you have questions regarding this letter, please contact me at (202) 874-4957 or by email at: largebanks@occ.treas.gov. Please reference the application control number in any correspondence.

Sincerely,

Robert A. Sihler
Senior Licensing Analyst

cc: David K. Wilson, EIC (electronic)
    Official File
    Large Bank Licensing Chron



Comptroller of the Currency
Administrator of National Banks

Washington, DC 20219

March 20, 2010

Mr. James E. Hanson
Senior Vice President
Wells Fargo Bank, National Association
90 South Seventh Street
Minneapolis, MN 55479

Re: Applications to merge Wachovia Bank, National Association, Charlotte, North Carolina
and Wachovia Bank of Delaware, National Association, Wilmington, Delaware with and
into Wells Fargo Bank, National Association, Sioux Falls, South Dakota
Application Control Number: 2009-ML-02-0012

Dear Mr. Hanson:

This letter is the official acknowledgement, authorization and certification by the Office of the
Comptroller of the Currency (OCC) that effective March 20, 2010 Wachovia Bank, National
Association, Charlotte, North Carolina and Wachovia Bank of Delaware, National Association,
Wilmington, Delaware merged with and into Wells Fargo Bank, National Association, Sioux
Falls, South Dakota, under the title of the latter. As result of the merger, the OCC has
renumbered the charter number of Wells Fargo Bank, National Association (the resulting bank)
from charter number 1741 to charter number 1.

This letter is also the official authorization for Wells Fargo Bank, National Association to
operate the former main office of Wachovia Bank of Delaware, National Association and the
branch offices of Wachovia Bank, National Association and Wachovia Bank of Delaware,
National Association as branches of Wells Fargo Bank, National Association. A list of branches
for the resulting bank will be sent under separate cover.

If you have questions regarding this letter, please contact me at (202) 874-5294 or by e-mail at
Stephen.Lybarger@occ.treas.gov. Please reference the application control number in any
correspondence.

Sincerely,

Stephen A. Lybarger

Stephen A. Lybarger
Large Bank Licensing Lead Expert



John S. Hogan
Bergen County Clerk

**Bergen County Clerk**
One Bergen County Plaza
Hackensack, NJ 07601
(201) 336-7000
www.bergencountyclerk.org/



| | |
|---|---|
| **Document Type:** Deed - Exempt | Transaction #: |
| | Document Page Count: 6 |
| | Operator Id: CLERK |

| RETURN TO: | SUBMITTED BY: |
|---|---|
| CHICAGO TITLE COMPANY LLC<br>2446 CHURCH RD<br>3RD<br>TOMS RIVER NJ 08753 | |

| PRIMARY NAME | SECONDARY NAME |
|---|---|
| JOAN  BONGIORNO | JOSEPH  BONGIORNO |

**ASSOCIATED DOCUMENT(S):**

| | |
|---|---|
| MUNICIPALITY: ALPINE<br>LOT: 5<br>BLOCK: 81a<br><br>FEES / TAXES: | INSTRUMENT #: 16-015522.01<br>Recorded Date: 02/24/2016 03:57:49 PM |
| Recording: $93.00 | I hereby CERTIFY that this document is recorded in the Clerk's Office in Bergen County, New Jersey. |
| Total: $93.00 | John S. Hogan<br>Bergen County Clerk |

## OFFICIAL RECORDING COVER PAGE

Page 1 of 7

# PLEASE DO NOT DETACH

## THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

NOTE: If document data differs from cover sheet, document data always supersedes.
*COVER PAGE DOES NOT INCLUDE ALL DATA, PLEASE SEE INDEX AND DOCUMENT FOR ANY ADDITIONAL INFORMATION.

This Deed is made on February 17, 2016

**BETWEEN** Joan Bongiorno 1996 Residence Trust, Robert Bongiorno, Lauren Lenok and Howard Bongiorno, Trustees

Whose post office address is Canterbury Court, Alpine, New Jersey 07620

referred to as the Grantor,

**AND** Joseph Bongiorno and Joan Bongiorno, As Tenants by the Entirety

Whose post office address is Canterbury Court, Alpine, New Jersey 07620

referred to as the Grantee.

The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

1. **Transfer of Ownership**. The Grantor grants and conveys (transfer ownership of) The property (called the "Property") described below to the Grantee. This transfer is made for the sum of TEN DOLLAR ($10.00)

The Grantor acknowledges the receipt of this money.

2. **Tax Map Reference**. (N.J.S.A. 46:15-1.1) Municipality of Alpine

Block No.: 81-A        Lot No.: 5

3. **Property.**    The Property consists of the land and all the buildings and structures on the land in the Borough of Alpine, County of Bergen and State of New Jersey.

The Legal Description is

BEGINNING in the southwesterly corner of the herein described tract known as Lot 5 Block 81-A as shown on a certain map entitled "Final Subdivision Plat formerly Lot 1 Block 80 in the Borough of Alpine, Bergen County, New Jersey, Cambridge Estates, November 15, 1965" said southwesterly corner being in the easlerly sideline of Anderson Avenue and running thence (1) along the easlerly sideline of Anderson Avenue north 30 degrees 55 minutes 06 seconds, East 302.97 feet to a point of curvature; thence (2) on a curve to the right on a radius of 15.00 feet an arc distance of 28.38 feet to a point of tangency on the southerly sideline of Canterbury Court; thence (3) along the southerly sideline of Canterbury Court South 40 degrees 40 minutes 24 seconds, East 209.20 feet to the northwesterly corner of Lot 4 Block 81-A; thence (4) South 14 degrees 58 minutes 58 seconds, West 379.65 feet to a point; thence (5) along the lands now or formerly L. + A. Parsells, North 39 degrees 37 minutes 28 seconds, West 342.00 feet to the point or place of beginning.
CONTAINING 88,151 square feet.
SAID lot is also known as Lot 5 in Block 81-A as shown on a certain map entitled "Final Subdivision Plat formerly Lot 1 Block 80 in the Borough of Alpine, Bergen County, New Jersey, Cambridge Estates, Scale 1" -100', Total area 45.54 Ac. November 15, 1965" made by Conklin Associates, Engineering and Surveying, Ramsey, New Jersey, which map was filed in the Bergen County Clerk's Office as Map No. 6412 on March 4, 1966.
SUBJECT to a 75-foot setback line as shown on said map.
SUBJECT to rights, public and private, in and to any brooks, streams or other waterways crossing the subject premises.
SUBJECT to restrictions contained in Deed Book 1698 page 446.
SUBJECT to utility easement to Public Service Electric and Gas recorded in Book 4876 page 136. SUBJECT to Municipal Zoning Ordinances. Providing all of the above do not prevent the use and occupancy of the premises as a one-family dwelling.
SAID PREMISES BEING known as Canterbury Court, Alpine, New Jersey 07620
Being a part of the same premises conveyed to Joan Bongiorno on September 8, 1978 and recorded in the Bergen County Clerk's Office on September 12, 1978 in Book 6435, Page 215-217 and being and intended to be the same premises as conveyed to the Grantor by deed made by Joan Bongiorno, dated May 30, 1996, recorded in the Bergen

**4. Promises by Grantor.** The Grantor promises that the Grantor has done no act to encumber the Property. This promise is called a "covenant as to grantor's act" (N.J.S.A. 46:4-6). This promise means that the Grantor has not allowed anyone else to obtain any legal rights which affect the Property (such as making a mortgage or allowing a judgment to be entered against the Grantor).

5. **Signatures.** The Grantor signs this Deed as of the date at the top of the first page,

Witnessed By:

_Marc Zimmerman_

ROBERT BONGIRONO

LAUREN LENOK

HOWARD BONGIORNO

STATE OF NEW YORK, COUNTY OF NEW YORK

I CERTIFY that on February 17, 2016, ROBERT BONGIORNO, individually and as Trustee of the Joan Bongiorno 1996 Residence Trust, personally came before me and stated to my satisfaction that this person:
(a) was the maker of this Deed;
(b) executed this Deed as his or her own act; and,
(c) made this Deed for $ 10.00 as the full and actual consideration paid or to be paid for the transfer of title.
(Such consideration is defined in N.J.S.A. 46:15-5.)

MARC A ZIMMERMAN
NOTARY PUBLIC-STATE OF NEW YORK
No. 02Z16302273
Qualified in Nassau County
Commission Expires April 28, 2018

STATE OF NEW YORK, COUNTY OF NEW YORK

I CERTIFY that on February 18 , 2016, LAUREN LENOK, individually and as Trustee of the Joan Bongiorno 1996 Residence Trust, personally came before me and stated to my satisfaction that this person:
(a) was the maker of this Deed;
(b) executed this Deed as his or her own act; and,
(c) made this Deed for $ 10.00 as the full and actual consideration paid or to be paid for the transfer of title.
(Such consideration is defined in N.J.S.A. 46:15-5.)

MARC A ZIMMERMAN
NOTARY PUBLIC-STATE OF NEW YORK
No. 02Z16302273
Qualified in Nassau County
My Commission Expires April 28, 2018

STATE OF NEW YORK, COUNTY OF NEW YORK

I CERTIFY that on February 17, 2016, HOWARD BONGIORNO, individually and as Trustee of the Joan Bongiorno 1996 Residence Trust, personally came before me and stated to my satisfaction that this person:
(a) was the maker of this Deed;
(b) executed this Deed as his or her own act; and,
(c) made this Deed for $ 10.00 as the full and actual consideration paid or to be paid for the transfer of title.
(Such consideration is defined in N.J.S.A. 46:15-5.)

RECORD AND RETURN TO:
The Law Offices of Michael A. Zimmerman
Attn: Michael A. Zimmerman
1350 Avenue of the Americas, 26th Floor
New York, New York 10019

MARC A ZIMMERMAN
NOTARY PUBLIC-STATE OF NEW YORK
No. 02Z16302273
Qualified in Nassau County
My Commission Expires April 28, 2018